## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ZHEJIANG SANMEI CHEMICAL IND. CO., LTD., SHANDONG DONGYUE CHEMICAL CO., LTD., and HUANTAI DONGYUE INTERNATIONAL TRADE CO.LTD<br><br>  Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>  Defendant. | Court No. 22-00103 |

### COMPLAINT

Plaintiffs Zhejiang Sanmei Chemical Ind. Co., Ltd. ("Zhejiang Sanmei"), Shandong Dongyue Chemical Co., Ltd. ("Shandong Dongyue") and Huantai Dongyue International Trade Co. Ltd. ("Huantai Dongyue"), by and through their attorneys, Fox Rothschild LLP, allege and state as follows:

### THE ADMINISTRATIVE DECISION TO BE REVIEWED

1.      Zhejiang Sanmei, Shandong Dongyue and Huantai Dongyue contest certain aspects of the final determination of the antidumping investigation Pentafluoroethane (R-125) from the People's Republic of China (A-570-137), issued by the International Trade Administration of the United States Department of Commerce ("Commerce"). The contested determination covered Plaintiff's' exports of Pentafluoroethane (R-125) to the  United States that were made between July 1, 2020, and December 31, 2020.

1

2.      Commerce issued the contested final determination on December 30, 2021. Notice of the final determination was published in the Federal Register on January 10, 2022. *See Pentafluoroethane (R-125) From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 87 Fed. Reg. 1117 (January 10, 2022) ("Final Determination"). The findings and conclusions of the contested determination were set forth in an accompanying Issues and Decision Memorandum for the Final Determination, dated December 30, 2021 ("Final I&D Memo").   The final determination calculated an antidumping duty margin of  277.95% antidumping duty margin applicable to each Plaintiff.

3.      On March 9, 2022, the 277.95% antidumping duty margin calculated for Plaintiffs was subsequently incorporated into an antidumping order. *See Pentafluoroethane (R–125) From the People's Republic of China: Antidumping and Countervailing Duty Orders*, 87 Fed. Reg. 12081 (March 3, 2022) and *Pentafluoroethane (R–125) From the People's Republic of China. See also Antidumping and Countervailing Duty Orders; Correction*, 87 Fed. Reg. 13270 (March 9, 2022).

## **JURISDICTION**

4.      Plaintiffs bring this action pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and § 1516a(a)(2)(B)(i) to contest the aforesaid final determination. This Court has sole jurisdiction over this matter under 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2).

## **STANDING**

5.      Plaintiffs, three producers and/or exporters to the United States of Pentafluoroethane (R-125), are interested parties within the meaning of 19 U.S.C. § 1677(9)(A)

and 19 U.S.C. § 1516a(f)(3). As interested parties that actively participated in the underlying

administrative proceeding, Plaintiffs have standing to bring this action pursuant to 19 U.S.C. §

1516a(d) and 28 U.S.C. § 2631(e).

## TIMELINESS

6.      This action is timely as this Complaint is being filed within 30 days of the filing

of the Summons that initiated this case. *See* Rule 3(a)(2) of the Rules of the U.S. Court of

International Trade and 28 U.S. § 2636 (c).

## STANDARD OF REVIEW

7.      This Court reviews final determinations of antidumping investigations issued by

Commerce pursuant to 19 U.S.C. § 1675(a) to determine whether they are "unsupported by

substantial evidence on the record or otherwise not in accordance with law." 19 U.S.C. § 1516a

(b)(1)(B)(i).

## STATEMENT OF FACTS

8.      Commerce initiated the contested antidumping investigation on February 1, 2021.

*Pentafluoroethane (R-125) From the People's Republic of China: Initiation of Less-Than-Fair-*

*Value Investigation*, 86 Fed. Reg. 8583 (February 8, 2021).  Plaintiff Zhejiang Sanmei

participated in the investigation as a mandatory respondent.  Plaintiffs Huantai Dongyue, and

Shandong Dongyue participated in the investigation as separate rate respondents who were not

subject to individual examination.

9.      Zhejiang Sanmei participated in the investigation by responding fully to all

information requests issued by Commerce in a complete and timely manner. Zhejiang Sanmei

responded separately to Section A (general, corporate, sales/distribution activities), C (United

States sales), Section D (cost of production) of the initial questionnaire, the critical circumstances questionnaire, and three supplemental questionnaires in timely fashion.

10.     Huantai Dongyue and Shandong Dongyue each cooperated with Commerce's investigation as separate respondents.  Each company submitted a Separate Rate Application and each responded to supplemental questionnaires.

11.     On August 17, 2021, Commerce published the preliminary determination in the Federal Register. *Pentafluoroethane (R-125) From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 86 Fed. Reg. 45959 (August 17, 2021). In the preliminary determination, Commerce calculated a preliminary antidumping margin for Zhejiang Sanmei equal to 280.37%. Commerce assigned the calculated weighted-average dumping margin of Zhejiang Sanmei to the separate rate companies, including Huantai Dongyue and Shandong Dongyue.

12.     On August 17, 2021, Zhejiang Sanmei filed a significant ministerial error allegation with respect to the preliminary determination.  On September 7, 2021, Commerce responded to the allegation and determined that the allegations did not constitute a significant ministerial error within the meaning of 19 CFR 351.224(f) and (g), and that the alleged ministerial errors were methodological decisions intentionally made by Commerce.

13.     On September 9, 2021, in lieu of an on-site verification, Commerce issued a Verification Questionnaire to Zhejiang Sanmei. On September 20, 2021, Zhejiang Sanmei submitted a timely response to the Verification Questionnaire.

14.     On October 20, 2021, Zhejiang Sanmei filed a timely administrative case brief. On October 26, 2021, Zhejiang Sanmei submitted a timely rebuttal brief in response to issues in Petitioner's cased brief that related to Zhejiang Sanmei.

15.     On January 3, 2022, Commerce announced the final determination, which was accompanied by a Final I&D Memo. In the final determination, Commerce agreed with Sanmei and removed steam as an energy input from the calculation of normal value. Commerce also revised the distance used in the calculations to account for the movement expenses incurred on shipping inputs from Zhejiang Sanmei to its affiliated processor Fujian Qingliu.  All other arguments set forth by Zhejiang Sanmei in its administrative case brief were rejected by Commerce.  In the final determination, Commerce reduced the 280.37% margin applicable to each respondent in the preliminary determination to 277.95%.

16.     On January 10, 2022, Commerce published the final determination in the Federal Register. *Pentafluoroethane (R-125) From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 87 Fed. Reg. 1117 (January 10, 2022).

17.     On January 7, 2022, Zhejiang Sanmei timely filed allegations of three ministerial errors made in the final determination in accordance with 19 C.F.R. § 351.224(c)(l).  On February 9, 2022, Commerce issued a memo rejecting Zhejiang Sanmei's allegations of ministerial error and made no changes to the final determination.

18.     Commerce published the antidumping duty order in the *Federal Register* on March 3, 2022. See *Pentafluoroethane (R–125) From the People's Republic of China: Antidumping and Countervailing Duty Orders,* 87 Fed. Reg. 12081 (March 3, 2022).

19.     On April 4, 2022, Zhejiang Sanmei, Shandong Dongyue and Huantai Dongyue filed a timely summons to initiate this action.

## STATEMENT OF CLAIMS

Plaintiffs challenge the *Final Determination* of the antidumping investigation for the following reasons:

## COUNT 1

20.     Paragraphs 1 through 19 are incorporated by reference herein.

21.     Commerce calculated separate surrogate US$/metric ton ("MT")/kilometer ("KM") inland trucking freight factor for export transactions (used in the U.S. price calculation) and import transactions (used in the normal value calculation) by calculating a simple average of the applicable Russian intra-city trucking rates with Russian long-distance trucking rates.

22.     The administrative record in this case establishes that the distance between Zhejiang Sanmei's factory and Wenzhou, the international seaport nearest to Sanmei's factory, was 187.2 km.  Zhejiang Sanmei incurred only long-distance shipping expenses. Zhejiang Sanmei did not incur any intra-city freight expenses.

23.     Inclusion of an intra-city truck freight rate in the calculation of surrogate truck freight factor meant to reflect a long-distance freight transport cost distorted the freight calculation and was therefore unsupported by substantial evidence in the administrative record or was otherwise contrary to law.

## COUNT 2

24.     Paragraphs 1-23 are incorporated by reference herein.

25.     Even if the use of intra-city and long-distance freight rates is affirmed, Commerce's calculation of the surrogate trucking freight factor was mathematically incorrect, as

it failed to calculate average "US$/MT/Km" freight rates as intended by Commerce in the final determination.

26.      Commerce's preliminary and final determinations merely took the simple average of the two calculated US$/MT/KM freight rates and claimed to have calculated "average USD/MT/KM" freight rates. To properly calculate an average "USD/MT/KM freight rate" from two transactions that incorporate three distinct variables, it is mathematically necessary to separately calculate the average dollar cost of the two transactions, the average weight of the two transactions, and the average distances of the two transactions. Then, the average dollar value of the two transactions should be divided by the average weight of the two transactions and then should be divided by the average distance of the two transactions. This is the only methodology that will result in the "average US$/MT/ KM freight rate" intended by Commerce.

27.     The use of a mathematically incorrect simple average averaging methodology to determine the average US$/MT/KM freight rates was unsupported by substantial evidence and otherwise contrary to law.

## **COUNT 3**

28.     Paragraphs 1 through 27 are incorporated by reference herein.

29.     Commerce improperly applied partial adverse facts available ("AFA") to value the intermediate product anhydrous hydrofluoric acid ("AHF") directly, rather than valuing the various factors of production ("FOP") necessary to produce AHF.  Commerce should have used its normal methodology and valued the upstream FOPs that were used in the production of intermediate product AHF, which were properly reported by Zhejiang Sanmei and its production affiliate Fujian Qingliu.

7

30.     Commerce's failure use of the intermediate input methodology in the final determination was unsupported by substantial evidence and was otherwise not in accordance with law.

## COUNT 4

31.     Paragraphs 1 through 30 are incorporated by reference herein.

32.     Commerce's final determination improperly disallowed all of Zhejiang Sanmei's claimed by-product offsets. The administrative record demonstrated, however, that Zhejiang Sanmei's by-product offsets were adequately documented and should have been granted in the final determination.

33.     Commerce's failure to grant Zhejiang Sanmei's properly documented by-product offsets was unsupported by substantial evidence and was otherwise contrary to law.

## COUNT 5

34.     Paragraphs 1 through 33 are incorporated by reference herein.

35.     Commerce improperly used the 2018 HaloPolymer Kirovo-Chepetsk LLC ("HaloPolymer") financial statement to calculate the surrogate financial ratios, rather than the 2020 HaloPolymer financial statement that was contemporaneous with the period of investigation.

36.     There were two sets of financial statements on the record, each for the same Russian producer of identical and comparable merchandise. The petitioner submitted the 2018 financial statements of HaloPolymer, while Zhejiang Sanmei submitted the 2020 financial statements of HaloPolymer.

37.     Although the 2020 financial statements of HaloPolymer were contemporaneous with the period of investigation, Commerce nevertheless used the 2018 HaloPolymer financial statement to calculate the surrogate financial ratios.  Commerce first questioned the translation accuracy of the 2020 HaloPolymer financial statement.  The financial statements and the auditor's notes, however were translated in their entirety and did not affect Commerce's ability to calculate the three financial ratios.  Commerce's rejection of the 2020 financial statement was unsupported by substantial evidence and was otherwise not in accordance with law.

38.     Commerce also rejected the 2020 HaloPolymer financial statement on the basis that the company was not profitable in 2020.  Commerce acknowledged that the HaloPolymer 2020 P&L statement showed a profit before tax equal to 22,933,000 rubles.  Normally, Commerce assesses the profitability of a company by looking to the profit before tax line contained in the P&L statement.

39.     In the final determination, Commerce adjusted the reported profit before taxes line item by removing "other income" and "other expenses" that were reported in the P&L statement below profit before taxes line item.  In so doing, Commerce determined that HaloPolymer financial statements in fact showed a 1,161,000 ruble "loss".

40.     Commerce's adjustment to HaloPolymer's reported profit before tax was unsupported by substantial evidence and otherwise contrary to law.

<u>**COUNT 6**</u>

41.     Paragraphs 1 through 40 are incorporated by reference herein.

42.     Commerce's regulations provide that if a factor of production is produced in a market economy country, is purchased from a market economy supplier and is paid for in a

market economy currency, Commerce will normally use the price paid to the market economy supplier to value that factor if at least 85% of the factor is purchased from a market economy supplier.  *See* 19 C.F.R. § 351.408(c)(1).

43.     The administrative record establishes that Zhejiang Sanmei purchased 100% of the raw material input PCE from market economy suppliers.  In the final determination, however, Commerce valued approximately 50% of PCE inputs at the market economy prices and valued the remaining PCE inputs with surrogate prices.  Commerce's failure to value 100% of Zhejiang Sanmei's PCE purchases of PCE using market economy prices was unsupported by substantial evidence and otherwise contrary to law.

## COUNT 7

44.     Paragraphs 1-43 are incorporated by reference herein.

45.     As discussed in Count 3 above, Commerce valued the intermediate input AHF directly, using a surrogate value for the reported AHF inputs, rather than separately valuing the upstream inputs of AHF as had been proposed by Zhejiang Sanmei.  In so doing, Commerce relied upon a dataset imported into its final SAS program that was submitted by Zhejiang Sanmei.  That dataset, however, was a consolidated FOP data base for both R-125 production and the upstream production of AHF.

46.     Consequently, for the inputs that were common to both R-125 production and upstream AHF production, the FOPs reflected the combined production of R-125 and the upstream production of AHF, rather than the production of R-125 alone.  This resulted in the double-counting of the common inputs of R-125 and the upstream production of AHF.

47.     Commerce's double counting of the common inputs of R-125 and the upstream production of AHF was unsupported by substantial evidence and was otherwise contrary to law.

## COUNT 8

48.     Paragraphs 1-47 are incorporated by reference herein.

49.     In the final determination, Commerce added an amount to Zhejiang Sanmei's market economy purchases of imported PCE to account for the transport of the imported input from Zhejiang Sanmei to its affiliated producer Fujian Qingliu. Commerce then stated that it also added the same amount to account for the distance between Zhejiang Sanmei to Fujian Qingliu for Fujian Qingliu's purchases of all of its other inputs.

50.   The administrative record, however, established that Fujian Qingliu only sourced imported PCE from Zhejiang Sanmei and that Fujian Qingliu purchased all other inputs directly from domestic suppliers.  Zhejiang Sanmei duly reported Fujian Qingliu's purchases of all materials inputs other than imported PCE from domestic suppliers and provided the names of the of each supplier for each domestically sourced input, as well as the quantity and value of each purchase from each domestic supplier and calculated the actual and sigma-capped distances between each domestic supplier and Fujian Qingliu.  Moreover, in response to Commerce's verification questionnaire Zhejiang Sanmei provided Fujian Qingliu's purchase invoices from its domestic suppliers of cobalt chloride hexahydrate and coal.

51.     Commerce's replacement of the actual distances between Fujian Qingliu and its domestic suppliers with the distance between Fujian Qingliu and Zhejiang Sanmei for all of Fujian Qingliu's inputs other than the imported PCE inputs, was unsupported by substantial evidence and is otherwise contrary to law.

11

## COUNT 9

52.      Paragraphs 1-51 are incorporated by reference herein.

53.       In the final determination Commerce applied adverse facts available ("AFA") to determine the antidumping margin for the China-wide entity.  As AFA, Commerce calculated an antidumping margin equal to 278.05%.  Commerce stated that the 278.05% margin was the highest transaction-specific rate calculated for Zhejiang Sanmei in the final determination.

54.      Commerce's statement, however, was factually incorrect. The stated 278.05% margin was not the highest transaction-specific rate calculated for Zhejiang Sanmei in the final determination. In Zhejiang Sanmei's Letter dated January 7, 2022, which alleged ministerial errors in the final determination., Zhejiang Sanmei identified an antidumping margin in the final SAS program that was equal to 428.91%.

55.      Commerce's application of the 278.05 percent margin as the antidumping duty margin for the China-wide entity was inconsistent with Commerce's stated intention to base the margin of the China-wide entity on the highest transaction-specific margin calculated in the final determination and was therefore, unsupported by substantial evidence in the administrative record and was otherwise contrary to law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a)   hold that Commerce's final determination was unsupported by substantial evidence in the administrative record and was otherwise not in accordance with law with respect to the claims set forth by Plaintiffs in this Complaint;

b)  remand the Final Determination to Commerce with instructions to recalculate the final margin for

     mandatory respondent Zhejiang Sanmei;

c)  assign Zhejiang Sanmei's revised final margin to the separate rate applicants Shandong Dongyue

     and Huantai Dongyue; and

d)  provide further and other relief in accordance with the Court's decision.

Respectfully submitted,

*/s/ Ronald M. Wisla*
Lizbeth R. Levinson
Ronald M. Wisla
Brittney R. Powell

FOX ROTHSCHILD LLP
2020 K Street,
NW Suite 500
Washington, DC  20006
Tel: (202) 794-1183
Email: rwisla@foxrothschild.com

*Counsel to Plaintiffs*

May 4, 2022