## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| Zhejiang Sanmei Chemical Ind. Co., Ltd.,<br>Shandong Dongyue Chemical Co., Ltd., and<br>Huantai Dongyue International Trade. Co., Ltd. )<br><br>Plaintiff,<br><br>v.<br><br>United States,<br><br>Defendant,<br><br>Honeywell International Inc.,<br><br>Defendant-Intervenor. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    **Court No.  22-00103**<br><br>   **PUBLIC VERSION**<br><br>   *Proprietary Information*<br>   *Removed from Pages 9-10, 16* |

## <u>RESPONSE BRIEF OF DEFENDANT-INTERVENOR HONEYWELL INTERNATIONAL INC.</u>

Daniel Cannistra
Michael Bowen

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

Counsel for Honeywell International Inc.

February 21, 2022

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ............................................................................1

I.      COMMERCE'S CALCULATION OF THE SURROGATE INLAND FREIGHT
        RATE WAS SUPPORTED BY SUBSTANTIAL EVIDENCE......................................7

II.     COMMERCE PROPERLY VALUED THE KEY INTERMEDIATE INPUT
        AHF DIRECTLY .........................................................................................................14

III.    COMMERCE PROPERLY DENIED SANMEI'S CLAIMED BY-PRODUCT
        OFFSETS.....................................................................................................................16

CONCLUSION..............................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alt. Sugar Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984) ................................................................................7

*China Processed Food Imp. & Exp. Co. v. United States,*
    536 F. Supp. 2d 1347 (Ct. Int'l Trade 2008) ...........................................................2

*Consol. Edison Co. v. NLRB,*
    305 U.S. 197, 229 (1938) .........................................................................................7

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) .................................................................................................7

*Downhole Pipe & Equip., L.P. v. United States,*
    776 F.3d 1369 (Fed. Cir. 2015) ................................................................................8

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) .............................................................................7, 8

*Goldlink Indus. Co. v. United States,*
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ...........................................................7

*Industrial Fasteners Group, American Importers Ass'n v. United States,*
    710 F.2d 1576 (Fed. Cir. 1983) ..............................................................................15

*Mittal Steel Galati S.A. v. United States,*
    502 F. Supp. 2d 1295, 31 Ct. Int'l Trade 1121, SLIP OP. 2007-110 (Ct. Int'l
    Trade 2007) .........................................................................................................8, 13

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ................................................................................7

*Qingdao Sea—Line Trading Co. v. United States,*
    766 F.3d 1378 (Fed. Cir. 2014) ................................................................................8

*QVD Food Co. v. United States,*
    658 F.3d 1318 (Fed. Cir. 2011) ................................................................................8

*Seah Steel Vina Corp. v. United States,*
    950 F.3d 833 (Fed. Cir. 2020) ..............................................................................8, 9

*Timken v. United States,*
    240 F. Supp. 2d 1228 (Ct. Int'l Trade 2002) ...........................................................2

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951) .................................................................................................7

*Zenith Electronics Corp. v. United States*,
  988 F.2d 1573 (Fed. Cir. 1993) ........................................................................... 15

*Zhejiang DunAn Hetian Metal Co. v. United States*,
  652 F.3d 1333 (Fed. Cir. 2011) ............................................................................. 8

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B) ......................................................................................... 7

19 U.S.C. § 1677b(c)(1) ......................................................................................... 8, 16

**Other Authorities**

*Difluoromethane (R-32) From the People's Republic of China: Antidumping Duty
  Order*, 86 FR 13886 (March 11, 2021) ......................................................... 13, 14

## STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Determination Under Review

The administrative determination under review is the final determination issued by the U.S. Department of Commerce ("Commerce") in *Pentafluoroethane (R-125) From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part*, 87 Fed. Reg. 1,117 (January 10, 2022) (*Final Determination*), Public Record ("PR") 281, incorporated in *Pentafluoroethane (R-125) From the People's Republic of China: Antidumping and Countervailing Duty Orders*, 87 Fed. Reg. 12,081 (March 3, 2022) (the *Orders*), PR 291.

### II.   Statement of the Issues[1]

1. Whether Commerce's inclusion of the St. Petersburg freight cost in the calculation of the surrogate freight expenses was supported by substantial evidence and in accordance with law.

2. Whether Commerce's method of calculating the surrogate freight expenses was supported by substantial evidence and in accordance with law.

3. Whether Commerce's direct valuation of the intermediate input AHF in the calculation of the factors of production ("FOPs") was supported by substantial evidence and in accordance with law.

---

[1] In its complaint, Sanmei alleges nine Counts. Counts 1-4 relate to the issues detailed here. ECF No. 8 at 6-8.  In its motion for judgment upon the agency record, plaintiffs' arguments are limited to the allegations in Counts 1-4.  ECF No. 29.  As such, in deciding the pending motion for judgment upon the agency record, the Court should not address the merits of Counts 5-9, because they have been abandoned and waived. CIT Rule 56.2(c) (requiring that a party moving for judgment upon the agency record state in its brief "the issues of law presented together with the reasons for contesting or supporting the administrative determination"); *see also, e.g., China Processed Food Imp. & Exp. Co. v. United States*, 536 F. Supp. 2d 1347, 1356 (Ct. Int'l Trade 2008) ("Because plaintiff did not include its first claim in its motion for judgment upon the agency record, that claim is not before the court."); *Timken v. United States*, 240 F. Supp. 2d 1228, 1231 n.2 (Ct. Int'l Trade 2002) (dismissing claims alleged in the complaint that were not presented in the motion for judgment on the agency record because "any claim which is not pressed is deemed abandoned") (quoting *De Laval Separator Co. v. United States*, 511 F. Supp. 810, 812 (Ct. Int'l Trade 1981)).

4.  Whether Commerce's denial of claimed by-product offsets was supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

On January 12, 2021, Commerce received antidumping duty (AD) and countervailing duty (CVD) petitions concerning imports of R-125 from China, filed in proper form on behalf of Honeywell International, Inc. (the petitioner).  *See* Petitioner's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties: R-125 (Pentafluoroethane) from the People's Republic of China," dated January 12, 2021 ("Petition"), PR 3-11.  On February 1, 2021, Commerce initiated the antidumping duty investigation of R-125 from China.  *See Pentafluoroethane (R–125) from the People's Republic of China: Initiation of Less-Than-Fair-Value Investigation*, 86 Fed. Reg. 8,583 (February 8, 2021) (*Initiation Notice*), PR 36.  On March 12, 2021, Commerce selected Zhejiang Quzhou Juxin Fluorine Chemical Co., Ltd., (Juxin) and Zhejiang Sanmei Chemical Ind. Co., Ltd. (Sanmei) for individual examination as mandatory respondents.  *See* Memorandum, "Respondent Selection," dated March 12, 2021, PR 93/Confidential Record ("CR") 33.  Also on March 12, 2021, Commerce issued the antidumping duty questionnaire to both Juxin and Sanmei.  *See* Commerce's Letter, "Antidumping Duty Questionnaire," dated March 12, 2021, PR 94-103.

Commerce received Sanmei's response to Section A of the questionnaire on April 9, 2021. *See* Sanmei's Letter, "Submission of Zhejiang Sanmei's Section A Response," dated April 9, 2021 ("Sanmei AQR"), PR 121-125/CR 70-72.  In May 2021, Commerce received responses to Sections C and D.  *See* Sanmei's Letter, "Submission of Zhejiang Sanmei's Section C Response," dated May 3, 2021 ("Sanmei CQR"), PR 144/CR 96-99; and Sanmei's Letter, "Submission of Zhejiang Sanmei's Section D Response," dated May 11, 2021 ("Sanmei DQR"), PR 149/CR 102-116.  On

June 3, 2021, Commerce published in the Federal Register a postponement of the preliminary determination by 50 days, until no later than August 10, 2021. *See Pentafluoroethane (R–125) from the People's Republic of China: Postponement of Preliminary Determination in the Less-Than-Fair-Value Investigation*, 86 FR 29752 (June 3, 2021), PR 160.

From May through July 2021, Commerce received comments from the petitioner and Sanmei regarding the selection of the appropriate surrogate country from which to select surrogate values (SVs) in the investigation as well as affirmative and rebuttal factual information relating to SVs from the relevant countries. *See* Petitioner's Letter, "Petitioner's Comments on the Selection of the Primary Surrogate Country," dated May 21, 2021, PR 154; and, Sanmei's Letter, "Surrogate Country Comments," dated May 28, 2021, PR 157. *See also* Petitioner's Letter, "Submission of Surrogate Values," dated June 14, 2021 ("Petitioner 1st SV Submission"), PR 165-169; Sanmei's Letter, "Initial Surrogate Value Submission," dated June 14, 2021 ("Sanmei 1st SV Submission"), PR 170; Petitioner's Letter, "Second Submission of Surrogate Values," dated July 12, 2021 ("Petitioner 2nd SV Submission"), PR 180; Sanmei's Letter, "Final Surrogate Value Submission," dated July 15, 2021 ("Sanmei 2nd SV Submission"), PR 182; Petitioner's Letter, "Surrogate Value Rebuttal Comments," dated July 26, 2021, PR 199; and, Sanmei's Letter, "Pentafluoroethane (R-125) from the People's Republic of China: Response to Commerce's Letter Dated July 29, 2021," dated August 2, 2021 ("Sanmei SV Response"), PR 206.

Also during this time, Commerce issued multiple supplemental questionnaires to Sanmei addressing various deficiencies in its initial reporting. *See* Sanmei's Letter, "Submission of Zhejiang Sanmei's Supplemental Section A Response," dated May 3, 2021 ("Sanmei SAQR"), PR 140/CR 75-77; *see also* Sanmei's Letter, "Submission of Zhejiang Sanmei's Supplemental Sections A and C Response," dated July 23, 2021 ("Sanmei SACQR"), PR 197/CR 123-126;

Sanmei's Letter, "Submission of Zhejiang Sanmei's Supplemental Section D Response," dated July 26, 2021 ("Sanmei SDQR"), PR 198/CR 127-150.  On July 29 and August 5, 2021, the petitioner submitted comments in advance of the preliminary determination also addressing the various deficiencies in Sanmei's reporting.  *See* Petitioner's Letter, "Antidumping Duty Investigation of R-125 (Pentafluoroethane) from the People's Republic of China: Pre-Preliminary Comments for Sanmei," dated July 29, 2021, PR 201/CR 151; and, Petitioner's Letter, "Antidumping Duty Investigation of R-125 (Pentafluoroethane) from the People's Republic of China: Additional Pre-Preliminary Comments," dated August 5, 2021, PR 210/CR 158.

On August 17, 2021, Commerce published the preliminary determination in the Federal Register.  *See Pentafluoroethane (R-125) From the People's Republic of China: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures,* 86 Fed. Reg. 45,959 (August 17, 2021), PR 233.  *See also* Memorandum, "Decision Memorandum for the Preliminary Determination in the Less-Than-Fair-Value Investigation of Pentafluoroethane (R-125) from the People's Republic of China," dated August 10, 2021 ("Commerce PDM"), PR 220.  Commerce assigned Sanmei a dumping margin of 280.37 percent, which was also assigned to the separate rate companies as the only individually calculated weighted-average dumping margin in the investigation.  *Id*. at *Preliminary Determination*.

On September 9, 2021, Commerce issued Sanmei a post-preliminary questionnaire to verify the information relied upon in making the final determination in lieu of an on-site verification.  *See* Commerce's Letter, "Zhejiang Sanmei Chemical Ind. Co., Ltd. Verification Questionnaire," dated September 9, 2021 ("Verification Questionnaire"), PR 247.  On September

20, 2021, Sanmei responded to the post-preliminary questionnaire. *See* Sanmei's Letter, "Submission of Zhejiang Sanmei's Verification Response," dated September 20, 2021 ("Sanmei VQR"), PR 255/CR 175-188.

In October 2021, Commerce received case and rebuttal briefs from petitioner and Sanmei. *See* Petitioner's Letter, "Case Brief," dated October 19, 2021 ("Petitioner Administrative Case Brief"); Sanmei's Letter, "Case Brief," dated October 19, 2021 ("Sanmei Administrative Case Brief"); Petitioner's Letter, "Rebuttal Brief," dated October 26, 2021 ("Petitioner Rebuttal Brief"); and, Sanmei's Letter, "Submission of Zhejiang Sanmei's Rebuttal Comments," dated October 26, 2021 ("Sanmei Rebuttal Brief"), PR 267-270/CR 191.

On January 10, 2022, Commerce published the final determination in the Federal Register. *See Final Determination*, *supra*; *see also* Memorandum, "Decision Memorandum for the Final Determination in the Less-Than-Fair-Value Investigation of Pentafluoroethane (R-125) from the People's Republic of China," dated December 30, 2021 ("Commerce IDM"), PR 272. In the final determination, Commerce assigned a final estimated dumping margin of 277.95 percent to Sanmei and the separate rate companies.

On March 3, 2022, Commerce published the antidumping duty in the Federal Register. *See* the *Orders*, *supra*. On April 4, 2022, plaintiffs filed summons to initiate this action. ECF No. 1.

## SUMMARY OF THE ARGUMENT

The Court should sustain Commerce's final determination because Commerce's calculation of Sanmei's normal value and export price is supported by substantial evidence and in accordance with law. Specifically, Sanmei's characterization of the St. Petersburg freight costs and their relevance in this investigation is unsupported by the record. Rather, Commerce reasonably included the St. Petersburg freight costs in the calculation of Sanmei's estimated freight

expenses, and its method of calculating Sanmei's freight expenses was based on sound analysis of the best available information in accordance with Commerce practice.  In addition, Commerce's valuation of the critical intermediate input AHF directly in lieu of Sanmei's reported upstream material inputs is supported by substantial evidence.  In that regard, the record demonstrates that Sanmei was unable to accurately quantify, report, and substantiate the consumption rates for the upstream material inputs in the production of AHF.  For similar reasons, substantial evidence further supports Commerce's denial of Sanmei's claimed by-product offsets.  Again, the record demonstrates that Sanmei was unable to accurately quantify, report, and substantiate the reported by-products produced in the production of AHF and subject merchandise during the period of investigation ("POI").  Accordingly, the Court should sustain Commerce's final determination.

## ARGUMENT

### I.     STANDARD OF REVIEW

In reviewing Commerce's antidumping duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  "Moreover, the Court may not substitute its judgment for that of {Commerce} when the choice is between two fairly

conflicting views, even though it could justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citation omitted).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions, *Alt. Sugar Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citation omitted). Commerce is accorded particular deference in antidumping and countervailing duty determinations. *See, e.g., Fujitsu*, 88 F.3d at 1039 ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.").

## II.    COMMERCE'S CALCULATION OF THE SURROGATE INLAND FREIGHT RATE WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

In selecting surrogate values, Commerce "attempts to construct a hypothetical market value of {the subject merchandise} in the {NME}." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1375 (Fed. Cir. 2015). Commerce's surrogate value determinations must "be based on the best available information regarding the values of {relevant} factors in a market economy country or countries." 19 U.S.C. § 1677b(c)(1); *see id.* § 1677b(a) (providing that Commerce constructs the 'normal value' "to achieve a fair comparison with the export price"). "Commerce has broad discretion to determine" what constitutes "the best available information," as this term "is not defined by statute." *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011). Commerce "generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the

period of review." *Qingdao Sea—Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014). *See also Seah Steel Vina Corp. v. United States*, 950 F.3d 833, 838 (Fed. Cir. 2020). On review, this Court does not "evaluate whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011) (citation omitted).  The Court "will not second-guess Commerce's choice." *Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295, 1313, 31 Ct. Int'l Trade 1121, SLIP OP. 2007-110 (Ct. Int'l Trade 2007) (explaining that "{w}here Commerce is confronted with two alternatives (both of which have their good and bad qualities), and Commerce has a preferred alternative," substantial evidence review means that we "will not second-guess Commerce's choice."); *see also Seah Steel*, 950 F.3d at 842-843.

Here, substantial evidence supports Commerce's calculation of the surrogate freight rates as applied to the normal value and U.S. export price calculations in this investigation.  In arguing that Commerce improperly considered the St. Petersburg freight cost, plaintiffs obscure the fact that Commerce calculated two distinct surrogate freight rates applicable to each operative comparison value: (1) the normal value (*i.e.*, surrogate home market price) and (2) the U.S. "ex-factory" export price.  In doing so, plaintiffs state boldly: "Zhejiang Sanmei's inland freight expenses were limited to only long-distance shipping costs.  Zhejiang Sanmei did not incur any intra-city freight costs." *See* Pl. Br. at 7.  Yet, the record demonstrates that inclusion of the St. Petersburg freight costs tracks more closely with the experience of the respondent than represented – and its exclusion would likely be more distortive of Sanmei's actual freight expenses during the POI.  Moreover, nowhere does the record in fact describe the St. Petersburg rate as an "intra-city rate."  Rather, the St. Petersburg rate was based on the exact same terms and calculated using the

exact same formula as the Moscow rate.  Additionally, even assuming that there are extra, unique "intra-city" expenses included in the surrogate St. Petersburg freight cost, the record reveals that this assumption would also apply equally to Sanmei's export of the subject merchandise during the POI.  Lastly, for the same reasons that exclusion of the St. Petersburg rate would likely result in a significantly less accurate estimation of Sanmei's dumping margin over the POI, so would Sanmei's preferred method of averaging the freight calculations.  Therefore, substantial evidence supports Commerce's calculation of the surrogate freight costs in this investigation.

First, with respect to valuing the factors of production in the normal value calculation, the record shows that Sanmei's suppliers were located as close as [          ] – not exactly a "long-haul." *See* Sanmei DQR at Exhibit D-6; and, Sanmei SDQR Exhibits SD-24–SD-25.  Indeed, Sanmei's reporting demonstrates that many of its suppliers are located much closer to its factory than represented in its case brief (*e.g.,* [          ], [          ], [          ], [          ], [          ], *etc.*).  *Id.* at Exhibits SD-24–SD-25.  These suppliers are substantially closer to Sanmei than its reported *Sigma* distance of 187 km, *i.e.*, the length between Sanmei and its nearest port.  *See* Sanmei DQR at 19.  The surrogate "import" freight rate calculated by Commerce from the data in *Doing Business Russia: 2020* is applied to these distances in the normal value calculation.  *See* Memorandum, "Final Analysis Memorandum for Zhejiang Sanmei Chemical Co., Ltd.," dated December 30 2021 ("Calculation Memorandum"), PR 277/CR 194; and, Memorandum, "Surrogate Value Memorandum for the Preliminary Determination," dated August 11, 2021 ("SV Memorandum"), PR 233.  Given the close range of the distances, measuring from [          ] in actual terms to 187 km as applied, it was entirely appropriate for Commerce to rely on both the St. Petersburg freight rate

(based on 8 km) and Moscow freight rate (based on 500 km) in the normal value calculation.[2]  In short, substantial evidence supports the inclusion of the St. Petersburg rate in the normal value calculation, and inclusion also tracks closely with the experience of the respondent during the POI.

Substantial evidence also supports inclusion of the St. Petersburg rate in the U.S. export price calculation, as Sanmei's claim that it does not incur "intra-city" freight expenses again fails to pass muster.  First, *Doing Business Russia: 2020* does not actually describe the published St. Petersburg freight cost as an "intra-city rate" but rather simply the cost to truck merchandise from the hypothetical factory in St. Petersburg to the nearest port, *i.e.*, 8 km away.  *See* Petitioner 1st SV Submission at Exhibit SV-3.1.  In point of fact, the St. Petersburg freight cost was published on the same terms as those for the surrogate Moscow shipment to the nearest port, which also happens to be located in St. Petersburg.  *Id.*  Specifically, *Doing Business* describes the published costs to include, "{l}oading or unloading of the shipment at the warehouse or port/border; transport between warehouse and port/border; {and,} traffic delays and road police checks while shipment is en route."  *Id.*  Moreover, Commerce calculated the freight rates for both Moscow and St. Petersburg in the exact same manner, using the exact same formula *i.e.*, USD/MT/KM.  *See* SV Memorandum at Exhibit 8.  Thus, no record evidence supports the assertion that the surrogate freight cost for St. Petersburg is based on an "intra-city rate;" *Doing Business* published the freight costs for both Moscow and St. Petersburg on the same basis, while Commerce calculated the resulting rates using identical formulas. *Id.*

---

[2] In estimating Sanmei's normal value, Commerce ultimately applies the surrogate freight costs to the "capped" weighted-average *Sigma* distances, which in this case ranged from, *e.g.*, [      ] km for fluorite powder and [      ] km for sodium hydroxide to [      ] km for magnesium chloride.  *See* Calculation Memorandum at 2.; *see also* SV Memorandum at 9.

Sanmei apparently bases its characterization of the St. Petersburg freight rate on an unsupported assumption that there are extra, unique "intra-city" costs incurred for the St. Petersburg shipment, which are purportedly not included in the Moscow rate nor incurred by Sanmei.  But the only assumption inferable from *Doing Business Russia: 2020* is that the Moscow factory shipment travels to the exact same port in the exact same manner as the St. Petersburg factory shipment, while one factory is merely closer to that port than the other.  Sanmei, for its part, also makes its export shipments through the nearest major port city, Wenzhou.  *See* Sanmei DQR at 19; *see also* Sanmei SDQR at Exhibit SD-24.  There is no evidence to support the assertion that the experience of Sanmei with respect to freight expenses is substantially different than either the surrogate Moscow or St. Petersburg factory.

In that regard, even if one were to assume that the surrogate St. Petersburg freight cost includes "intra-city" expenses, there is no evidence to suggest this assumption should not apply equally to the Moscow rate.  Similarly, the record demonstrates that Sanmei would incur at least some purported "intra-city" expenses during the remaining 8 km its export shipments also pass through the nearest city, *i.e.*, Wenzhou, to the Wenzhou port.  In the same regard, the Moscow shipments would also incur such "intra-city" expenses, just as any export shipment.  Sanmei's characterization of the published freight cost for St. Petersburg is therefore not supported by the record.  Even if accepted, however, the record shows that Sanmei's assumption should also apply equally to an estimation of its own freight expenses over the POI.

Additionally, as noted, Sanmei does not dispute that it incurred freight expenses for export shipments made through the nearest port city, Wenzhou, which is located 187 km away. *See* Pl. Br. at 7.  Yet, Sanmei asks the Court to require that Commerce apply a rate based solely on a 500 km shipment, nearly three times Sanmei's *Sigma* distance.  To be sure, using a freight rate based

11

solely on the Moscow shipment across 500 km would arguably be even <u>more</u> distortive than using <u>solely</u> the St. Petersburg rate (*compare* $500 - 187 = \Delta$ **313 km** *with* $187 - 8 = \Delta$ **179 km**). Thus, by following Sanmei's reasoning, one could just as easily claim that inclusion of the Moscow rate is nearly twice as distortive as would be relying solely on the St. Petersburg rate. As Commerce stated, however, Sanmei fails to sufficiently demonstrate that either rate is distortive – one is simply higher than the other. *See* Commerce IDM at 44. Further, Commerce has routinely and rightly found that "high or low prices alone, in the absent of other information, does not necessarily indicate that the price data is distorted or misrepresentative. Differences in prices alone is not a sufficient basis upon which to exclude a particular data point from the calculation of a surrogate value." *Id.* Thus, substantial evidence supports the inclusion of both rates in both the normal value and U.S. export price calculations.

For similar reasons, Sanmei's argument regarding Commerce's method of averaging the freight rates also fails. Sanmei argues that Commerce should average the individual components of the St. Petersburg rate over the 500 km Moscow freight distance, which would only diminish the relevance of the St. Petersburg costs over the Moscow freight distance, defeating the purpose of including it in the first place. Moreover, calculating a single average rate based on the individual equation components would result in a rate based on a 366 km shipment ($724 \text{ km} + 8 \text{ km} = 732$ km $/ 2 = 366$ km) which, again, is even more distortive in view of Sanmei's actual export distances than simply valuing Sanmei's freight expenses based on the 8 km St. Petersburg rate alone (*compare* $366 - 187 = \Delta$ **189** km *with* $187 - 8 = \Delta$ **179 km**). Once more, Sanmei fails to make a clear case as to why this calculation is *more* representative of its export experience, while obscuring the fact that it did in fact incur short-haul freight expenses during the POI.

Commerce, for its part, undertook a lengthy explanation as to why Sanmei's preferred method of calculation gives undue weight to distance, in light of the fact that freight rates are not a simple logarithmic function of distance. *See* Commerce IDM at 46. In its decision memorandum, Commerce spared no ink in explaining its reasoning in this regard, concluding that an average of the individual distance component disproportionally spreads out the variables for each freight rate over longer distances, contrary to the fact that "distance does not have a meaningful correlation, if any, with trucking rates." *Id.* Sanmei's argument regarding Commerce's method of calculation therefore not only fails on the merits, but also procedurally; substantial evidence supports Commerce's decision, and this evidence is plainly and expressly delineated in the final determination.

In that regard, as noted, "{w}here Commerce is confronted with two alternatives (both of which have their good and bad qualities), and Commerce has a preferred alternative," substantial evidence review means that the Court "will not second-guess Commerce's choice." *See Mittal Steel*, 502 F. Supp. 2d 1295 at 1313. Here, Commerce calculated the surrogate freights rates in the same manner it has in countless investigations, including as noted in the companion *R-32 from China* investigation in which Sanmei was also a party. *See* Commerce IDM at 45; *see also Difluoromethane (R-32) From the People's Republic of China: Antidumping Duty Order*, 86 FR 13886 (March 11, 2021) at Appendix II. As Commerce explained, its calculation of simple averages for surrogate values has been routinely upheld in the Courts. *See* Commerce IDM at 47. Nevertheless, Sanmei asks the Court to reweigh evidence that Commerce already sufficiently balanced and detailed in the final determination. Indeed, Commerce addressed each one of Sanmei's arguments in-kind and, in over eight pages, elucidated the record information and reasoning behind its surrogate freight calculations. *See* Commerce IDM at 39-47. Therefore,

Commerce's inclusion of the St. Petersburg freight cost and method of calculating the surrogate freight rates should be upheld as supported by substantial evidence and otherwise in accordance with law.

### III.   COMMERCE PROPERLY VALUED THE KEY INTERMEDIATE INPUT AHF DIRECTLY

Substantial evidence supports Commerce's valuation of AHF directly in its calculation of normal value in this investigation.  Specifically, the record shows, and Commerce properly found, that Qingliu – the producer for all reviewable sales during the POI – did not and cannot accurately quantify and substantiate its consumption of water in the production of R-125 because Qingliu does not track and record consumption of water in the normal course of business.  *See* Sanmei DQR at 16.  This is despite Sanmei initially failing to report water as a direct material input, while also stating that "water is an important factor in the production of both AHF and R-125 and has a *tremendous* impact on yield loss and by-product production."  *See* Sanmei Administrative Case Brief at 12 (Emphasis added.).   Moreover, Sanmei asserted in no uncertain terms that the production processes used by its affiliate-producer Qingliu differed from Sanmei with respect to both the source and consumption of water in the production of AHF, R-125, and resultant byproducts.  *See* Sanmei AQR at 32; Sanmei DQR at 5, 15-16; Sanmei VQR at Section III. Additionally, Sanmei also reported that neither Sanmei nor Qingliu even track or record yield loss in the normal course of business.  *Id*. at Sanmei VQR at Section III.

When given an additional opportunity to explain and support its reported input consumption rates and yield loss in the production of AHF, Sanmei merely provided the same information in addition to a new, theoretical calculation.  But even Sanmei noted the problems with the proffered theoretical calculation, stating:

> "In fact, taking account of water and impurities contained in by-product as well as any possible variance in reaction conditions and facility environment, a deviation to certain extent from the theoretical ratio may also take place in the actual industrial production process." *See* Sanmei SDQR at 7.

Moreover, as noted by Commerce, while Sanmei's standard calculation provided total input and output figures in an attempt to estimate total yield loss, Commerce requested that Sanmei provide yield loss estimations for each intermediate product and each stage of production. *See* Commerce IDM at n. 182 (citing Sanmei VQR at 34-36). Sanmei not only failed to provide this information, but also failed to make an earnest effort in estimating these figures.

It is the burden of interested parties to develop the record and support their arguments with record evidence. *See, e.g., Zenith Electronics Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary information."); and *Industrial Fasteners Group, American Importers Ass'n v. United States*, 710 F.2d 1576, 1582 n.10 (Fed. Cir. 1983) ("Because India possessed (or could gather) the necessary facts, the burden was its (not {Commerce's}) to furnish that information."). Sanmei failed to provide critical record information with respect to its water consumption and yield loss throughout the POI, despite multiple opportunities to do so. In spite of these deficiencies, Sanmei asks this Court to reweigh the evidence and find that Sanmei substantiated its reporting of the upstream material inputs in the production of AHF during the POI. However, the record demonstrates that by failing to accurately measure yield loss or water consumption during the POI, Sanmei cannot reasonably substantiate its reporting of the upstream inputs used in the production of AHF.

Further, as noted, the statute requires that the valuation of factors of production be based on the "best available information." 19 U.S.C. § 1677b(c)(1). Commerce duly reviewed and analyzed the record information with respect to Sanmei's AHF production, including Sanmei's comments, and thoroughly explained why Qingliu's failure to track and record water consumption

15

during the POI left Commerce with no choice but to value AHF directly in its calculation of the cost of R-125 production. *See* Commerce IDM at 23-24. Specifically, Commerce found that Sanmei failed to substantiate its reporting of the upstream inputs used in the production of AHF with original source documentation, including calculation worksheets for per-unit consumption of AHF, or support for yield loss at each stage of production. *Id.* at 23. When given another opportunity to provide this information, Sanmei merely provided the same deficient documentation provided initially on top of a dubious theoretical calculation, explaining that neither entity tracks yield loss in the course of business. *Id.*

By valuing the intermediate input, AHF, directly, Commerce therefore avoided relying on patently incomplete and/or incomplete data in the interest of calculating the most accurate estimate of Sanmei's dumping margin over the POI. *Id.* In doing so, Commerce relied on the "best available information," in accordance with the statute. Thus, as detailed here and by Commerce in the final determination, substantial evidence supports Commerce's decision to value directly the intermediate input AHF rather than the upstream material inputs.

## IV.   COMMERCE PROPERLY DENIED SANMEI'S CLAIMED BY-PRODUCT OFFSETS

Substantial evidence also supports Commerce's denial of Sanmei's claimed by-product offsets. As Commerce stated, the record holds "insufficient evidence to corroborate the volume of by-products generated in the production of subject merchandise and whether the sales of by-products included quantities generated in the production of non-subject merchandise or from other purchases." *See* Commerce IDM at 29. Specifically, Sanmei claimed [       ] of by-product offsets for every [       ] of R-125 produced, but only reported a total [       ] of inputs used to produce these products. *See* Sanmei SDQR at Exhibit 12; *see also* Sanmei SDQR at 8. This does not add up. Sanmei attempted to explain this difference by stating that "the by-products contain a

large amount of water." *Id.* at Sanmei SDQR at 8.  Yet, as noted, Qingliu did not track and record water consumption during the POI.  Additionally, Sanmei noted that the theoretical calculation provided for yield loss in the production of AHF and by-products did not account for the "quite a lot of water and other impurities," in the actual production of AHF and resultant by-products during the POI.  *Id.* at 7.  As Commerce stated, "{o}ne might assume that, if water is such an important component, Qingliu would measure its use to adequately track production."  *See* Commerce IDM at 30.  Nevertheless, for the same reasons that Commerce could not rely on the reported consumption rates of material inputs in AHF production, Commerce could not rely on Sanmei's claimed by-product offsets in the production of AHF for the POI.

Sanmei also failed to the substantiate the reported production of by-products in the production of R-125 during the POI.  For example, as Commerce noted with respect to hydrochloric acid, Sanmei stated that it is "just mixed together without distinction of source." *See* Sanmei SDQR at 5-6.  This is despite reporting that hydrochloric acid is "generated from both the production of R-125 and non-subject merchandise."  *See* Sanmei Administrative Case Brief at 22.  Nevertheless, "to be eligible for a by-product offset, a respondent must provide evidence to substantiate: (1) the quantity of the by-product it generated *from the production for subject merchandise* during the POI; and (2) that the by-product has commercial value." *See* Commerce IDM at 28 (Emphasis added.).  The record demonstrates that Sanmei could not demonstrably distinguish between hydrochloric acid produced in the production of subject and non-subject merchandise.  Therefore, substantial evidence supports Commerce's finding that Sanmei failed to demonstrate that it can adequately track production and sale of hydrochloric acid attributable to the production of R-125 during the POI.

Additionally, with respect to the production of R-134a, Commerce found that while Sanmei reported purchases of R-134a from Qingliu, and sales of R-134a to both affiliated and unaffiliated parties during the POI, Sanmei failed to keep warehouse-in documentation for these transactions. *See* Commerce IDM at 30-31.  Thus, Sanmei is unable to distinguish R-134a resulting from the production of R-125 or purchases from affiliated or unaffiliated parties.  *Id*. at 31.  Additionally, Sanmei also reported that R-134a undergoes additional processing for which there remains no record information.  *Id*. at 30.  As noted, the burden to develop the record and support its claims falls on the respondent.  Because Sanmei was unable to provide the necessary original source documentation supporting its reported by-product offsets, and unable to adequately explain the production of by-products during the POI, Commerce could not rely on the reported figures.

In sum, substantial evidence supports Commerce's decision to deny Sanmei's claimed by-product offsets.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court sustain Commerce's determinations.

Respectfully submitted,

/s/*Michael Bowen*
Daniel Cannistra
Michael Bowen

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

*Counsel for Honeywell International Inc.*

Dated: February 21, 2022

18

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing brief complies with the Standard Chambers Procedures of the U.S. Court of International Trade in that it contains 5,472 words including text, footnotes, and headings and excluding the table of contents, table of authorities and counsel's signature block, according to the word count function of Microsoft Word 2017 used to prepare this brief.

Respectfully submitted,

/s/ *Michael Bowen*
Daniel Cannistra
Michael Bowen

*Counsel for Honeywell*