# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

_____
)
ZHEJIANG SANMEI CHEMICAL IND. CO., )
LTD. SHANDONG DONGYUE CHEMICAL CO., )
LTD., and HUANTAI DONGYUE )
INTERNATIONAL TRADE CO., LTD., )
)
        Plaintiffs, )
)
    v. )      Court No. 22-00103
)
UNITED STATES, )
)
        Defendant, )
)
    and )
)
HONEYWELL INTERNATIONAL, INC., )
)
        Defendant-Intervenor. )
_____)

## DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

           BRIAN M. BOYNTON
           Principal Deputy Assistant Attorney General

           PATRICIA M. MCCARTHY
           Director

           L. MISHA PREHEIM
           Assistant Director

OF COUNSEL:            Kelly Geddes
JESUS N. SAENZ       Trial Attorney
Attorney              U.S. Dept. of Justice
Office of the Chief Counsel     Civil Division
    for Trade Enforcement and Compliance     Commercial Litigation Branch
U.S. Department of Commerce     P.O. Box 480
Washington, D.C.         Ben Franklin Station
                Washington, D.C. 20044
                Telephone: (202) 307-2867
                E-mail: Kelly.Geddes2@usdoj.gov

February 21, 2023         Attorneys for Defendant

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

---

| | |
|---|---|
| ZHEJIANG SANMEI CHEMICAL IND. CO., LTD. SHANDONG DONGYUE CHEMICAL CO., LTD., and HUANTAI DONGYUE INTERNATIONAL TRADE CO., LTD., )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES, )<br><br>Defendant, )<br><br>and )<br><br>HONEYWELL INTERNATIONAL, INC., )<br><br>Defendant-Intervenor. ) | Court No. 22-00103 |

---

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for judgment upon the agency record, the responses thereto, plaintiffs' reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment shall enter in favor of the United States.

_____
JUDGE

Dated:_____, 2023
    New York, NY

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................................... ii

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

    I.    The Administrative Determination Under Review ................................................. 2

    II.   Issues Presented For Review ................................................................................ 2

STATEMENT OF FACTS ........................................................................................... 2

SUMMARY OF ARGUMENT .................................................................................... 4

ARGUMENT ............................................................................................................... 5

    I.    Standard Of Review ............................................................................................ 5

    II.   Legal Framework For Surrogate Value Selection ................................................ 6

    III.   Commerce's Calculation Methodology Of The Surrogate Inland Freight Rate Is Supported By Substantial Evidence And In Accordance With Law ...................... 7

        A.    Commerce Reasonably Included St. Petersburg Frieght Rate Data In Its Inland Freight Calculation ......................................................... 8

        B.    Commerce Reasonably Relied On A Simple Averaging Methodology For Calculating Inland Freight ...................................................... 12

    IV.   Commerce Reasonably Chose To Directly Value The Intermediate Input AHF . 15

    V.   Commerce Reasonably Denied Zhejiang Sanmei A By-Product Offset .............. 20

CONCLUSION ........................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*Am. Tubular Prod., LLC v. United States*, 847 F.3d 1354 (Fed. Cir. 2017) ........................... 21, 23

*Arch Chems., Inc. v. United States*, 33 C.I.T. 954 (2009) ........................................... 20

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ................................. 5

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ................................................. 5

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) .................................................. 6

*Fuyao Glass Ind. Group Co., Ltd. v. United States*, 27 C.I.T. 1892 (Ct. Int'l Trade 2003) ......... 13

*Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006)................ 6, 14

*Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289 (Fed. Cir. 2014) ...................... 7

*INS v. Elias-Zacarias*, 502 U.S. 478 (1992) ..................................................... 6

*Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289 (Fed. Cir. 2016) ................ 7

*Juancheng Kangtai Chem. Co. v. United States*, No. 14-56, 2015 WL 4999467 (Ct. Int'l Trade
    Aug. 21, 2015) .............................................................................. 21

*Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442 (Fed.Cir.1994).......................... 10

*Linyi Chengen Imp. & Exp. Co. v. United States*, 487 F. Supp. 3d 1349 (Ct. Int'l Trade 2020) .. 16

*Nation Ford Chem. Co. v. United States*, 166 F.3d 1373 (Fed. Cir. 1999) ...................... 7, 10

*Nucor Corp. v. United States*, 612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ...................... 6

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014)................... 7

*Rhodia, Inc. v. United States*, 1185 F. Supp. 2d 1343 (Ct. Int'l Trade 2001).................... 12

*Shakeproof Assembly Components v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) ............... 15

*Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714 (Ct. Int'l Trade 2001).. 1, 6

*Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp v United States*, 28 C.I.T.
    1427 (Ct. Int'l Trade 2004)................................................................. 12

*Zhengzhou Harmoni Spice Co. v. United States*, 33 Ct. Int'l Trade 453 617 F. Supp. 2d 1281,
    1290 (2009)................................................................................. 15

**Statutes**

19 U.S.C. § 1516a ................................................................................ 5

19 U.S.C. § 1677b ........................................................................ 3, 6, 7, 15

19 U.S.C. § 1677e ............................................................................... 17

**Regulations**

19 C.F.R. § 351.401 ......................................................................... 20, 23

## Administrative Determinations

*1-Hydroxyethylidene-1, 1-Diphosphonic Act from China*, 84 Fed. Reg. 67,925 (Dep't of Commerce Dec. 12, 2019), and accompanying IDM .............................................................. 10

*Certain Fabricated Structural Steel from China*, 85 Fed. Reg. 5,376 (Dep't of Commerce Jan. 30, 2020) and accompanying IDM ...................................................................... 8

*Certain Frozen Warmwater Shrimp from Vietnam*, 76 Fed. Reg. 56,158 (Dep't of Commerce Sept. 12, 2011) and accompanying IDM ...................................................................... 11

*Drill Pipe from China*, 76 Fed. Reg. 1,966 (Jan. 11, 2011), and accompanying IDM ................ 15

*Steel Propane Cylinders from China*, 84 Fed. Reg. 29,161 (Dep't of Commerce June 21, 2019), and accompanying IDM ......................................................................................... 10

*Steel Wire Garment Hangers from China*, 80 Fed. Reg. 13,332 (Dep't of Commerce Mar. 13, 2015), and accompanying IDM ......................................................................... 10

*Xanthan Gum from China,* 80 Fed. Reg. 29,615 (Dep't of Commerce May 22, 2015), and accompanying IDM ............................................................................................... 15

## Other Authorities

Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), http://enforcement.trade.gov/policy/bull04-1.html ......... 7

# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

---

| | |
|---|---|
| ZHEJIANG SANMEI CHEMICAL IND. CO., LTD. SHANDONG DONGYUE CHEMICAL CO., LTD., and HUANTAI DONGYUE INTERNATIONAL TRADE CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> HONEYWELL INTERNATIONAL, INC., <br><br> Defendant-Intervenor. | Court No. 22-00103 |

---

## DEFENDANT'S RESPONSE TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD

Defendant, the United States, respectfully submits this response to the motion for judgment upon the agency record filed by plaintiffs Zhejiang Sanmei Chemical Ind. Co., Ltd. (Zhejiang Sanmei), Shandong Dongyue Chemical Co., Ltd., and Huantai Dongyue International Trade Co., Ltd., (collectively, plaintiffs) challenging the Department of Commerce's (Commerce) final determination in its antidumping duty investigation of Pentafluoroethane (R-125) from the People's Republic of China (China). Because Commerce's final determination is supported by substantial evidence and otherwise lawful, we respectfully request that the Court sustain Commerce's determination.

<u>**STATEMENT PURSUANT TO RULE 56.2**</u>

**I.      <u>The Administrative Determination Under Review</u>**

The administrative determination under review is *Pentafluoroethane (R-125) from China*, 87 Fed. Reg. 1,117 (Dep't of Commerce Jan. 10, 2022) (final affirmative determination of sales at less than fair value) (*Final Determination*) (P.R. 281), and accompanying Issues and Decision memorandum (IDM) (P.R. 272).[1]  The investigation covers the period from July 1, 2020, to December 31, 2020.

**II.     <u>Issues Presented For Review</u>**

1.      Whether Commerce's calculation methodology of the surrogate inland freight rate is supported by substantial evidence and in accordance with law.

2.      Whether Commerce's method of valuing the intermediate input anhydrous hydrofluoric acid (AHF) is supported by substantial evidence and in accordance with law.

3.      Whether Commerce reasonably denied Zhejiang Sanmei a by-product offset.

<u>**STATEMENT OF FACTS**</u>

On January 21, 2021, Commerce initiated the less-than-fair value investigation of Pentafluoroethane (R-125) from China.  *See Pentafluoroethane (R-125) from China,* 86 Fed. Reg. 8,583 (Dep't of Commerce Feb. 8, 2021) (P.R. 36).  Plaintiff Zhejiang Sanmei was a mandatory respondent, and plaintiffs Huantai Dongyue and Shangdong Dongyue were separate rate respondents that were not individually investigated.

The purpose of an antidumping duty investigation is to determine whether an imported product is being, or is likely to be, sold at less than fair value.  If Commerce determines that is

---

[1]  "P.R." refers to documents in the public record and "C.R." refers to documents in the confidential record.

the case, it will calculate an antidumping duty rate. This duty is the amount by which the "normal value" of subject merchandise exceeds its "export price (or the constructed export price)." 19 U.S.C. § 1673.

When Commerce conducts an antidumping duty investigation of an importer from a non-market economy, such as China, it must determine the subject merchandise's normal value using data from a market economy country that serves as a surrogate. 19 U.S.C. § 1677b(c)(1)(B). Commerce chooses a surrogate that is at a comparable level of economic development to the nonmarket economy country and that is a significant producer of subject merchandise. *Id*. § 1677b(c)(4)(A)-(B). In this review, Commerce selected the Russian Federation (Russia) as the surrogate country, a choice that no party has contested. *See Pentafluoroethane (R-125) from China*, 86 Fed. Reg. 45,959 (Dep't of Commerce Aug. 17, 2021), (P.R. 233) and accompanying Preliminary Decision Memorandum (PDM) at 8-10, (P.R. 220); IDM at 43 n. 287. Accordingly, data from Russia were used to value the factors of production in this investigation.

On August 17, 2021, Commerce published its preliminary determination. *See Pentafluoroethane (R-125) from China*, 86 Fed. Reg. 45,959 (Dep't of Commerce Aug. 17, 2021), (P.R. 233) and accompanying Preliminary Decision Memorandum (PDM), (P.R. 220). In response, Zhejiang Sanmei filed a case brief challenging several aspects of the decision, including the issues plaintiffs have raised in this action.

Commerce published its final determination on January 10, 2022. *See Pentafluoroethane (R-125) from China*, 87 Fed. Reg. 1,117 (Jan. 10, 2022). It made several adjustments to its calculation in response to Zhejiang Sanmei's brief, but rejected Zhejiang Sanmei's position on the three issues it has now brought before this Court: whether it was reasonable for Commerce to include freight rate data from St. Petersburg when calculating the surrogate inland freight rate

to apply to Zhejiang Sanmei; whether it was reasonable for Commerce to directly value anhydrous hydrofluoric acid (AHF), an intermediate input, rather than to value it by valuing the upstream factors of production; and whether it was reasonable for Commerce to deny Zhejiang Sanmei a byproduct offset.

## SUMMARY OF ARGUMENT

The Court should sustain Commerce's final determination. First, Commerce reasonably calculated the surrogate inland freight rate by using all available data from the World Bank's report, *Doing Business Russia*, which included data from Moscow and St. Petersburg. Plaintiffs argue that the St. Petersburg data should have been excluded because they are based on shorter-distance trips that are therefore more expensive per unit. However, Commerce was not required to exclude data from shorter freight trips, but rather followed its consistent practice of calculating a surrogate value representing a broad average by including all available data unless particular data is shown to be aberrational. In any case, plaintiffs failed to provide any support for their assumption that their freight rate would be more similar to the Moscow data than the St. Petersburg data.

Second, Commerce reasonably chose to directly value AHF instead of valuing its upstream inputs, because it determined, based on the evidence in the record, that it could not reliably value it based on upstream inputs. This is because Zhejiang Sanmei failed to substantiate its claim that all AHF used in the production of subject merchandise was self-produced; Zhejiang Sanmei and its affiliate, Fujian Qingliu, failed to substantiate yield loss at each stage of production; and Fujian Qingliu failed to track its water consumption, which is a key factor in production of AHF.

Third, Commerce reasonably denied Zhejiang Sanmei a byproduct offset because it failed

to substantiate the byproduct quantities that were reportedly produced from the production of subject merchandise and sold or reused during the period of investigation. Commerce was unable to substantiate those quantities in part due to the same issues that prevented it from valuing the factors of production of AHF: because it could not substantiate the quantity of AHF self-produced, the yield loss at each stage of production of both AHF and the subject merchandise, or Fujian's water usage throughout the process of producing AHF and subject merchandise, it could not substantiate the reported offsets. Further, although plaintiffs claim that documentation from Zhejiang Sanmei's warehouses substantiate the byproduct quantities, these documents did not reliably distinguish which byproducts were produced in the process of producing subject merchandise during the period of review and sold or reused within that same period.

## ARGUMENT

### I. Standard Of Review

The Court will uphold Commerce's determination if it is supported by "substantial evidence on the record" and is otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "more than a mere scintilla" of relevant and reasonable evidence to support the underlying conclusions. *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The requisite proof amounts to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (footnote and internal quotation marks omitted).

That the Court may draw two inconsistent conclusions from the record "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v.*

*Fed. Mar. Comm'n*, 383 U.S. 607 (1966) (citation omitted). Rather, when Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, as here, the agency's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion. *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

Thus, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d 714, 718 (Ct. Int'l Trade 2001); s*ee also Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) ("{T}he Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*.") (citations and internal quotation marks omitted).

## II.     Legal Framework For Surrogate Value Selection

As explained above, a less-than-fair value investigation requires Commerce to determine the normal value of the subject merchandise. Where it is investigating merchandise from a nonmarket economy country, it values the subject merchandise by determining the value of "the factors of production utilized in producing the merchandise." 19 U.S.C. § 1677b(c)(1). Factors of production include the "hours of labor required," "quantities of raw materials employed," "amounts of energy and other utilities consumed," and "representative capital cost, including depreciation" expended in producing subject merchandise. *Id*. § 1677b(c)(3). To those factors,

Commerce also adds "an amount for general expenses and profit plus the cost of containers coverings, and other expenses." *Id.* § 1677b(c)(1)(B).

To determine the value of the factors of production, Commerce must use "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate" by Commerce. *Id.* § 1677b(c)(1)(B). The statute does not define the term "best available information," and Commerce has broad discretion in reaching this determination. *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014). In practice, Commerce prefers surrogate values that are publicly available, specific to the input being valued, free of taxes and duties, reflective of broad market averages, and contemporaneous with the period under consideration. *See*, *e.g.*, *id.*; Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), http://enforcement.trade.gov/policy/bull04-1.html (last visited February 21, 2023) (Policy Bulletin 04.1).

While the data Commerce relies on must be the best available, "there is no requirement that the data be perfect." *Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1301 (Fed. Cir. 2016) (quoting *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)). Nor is Commerce required to duplicate the precise experience of the manufacturer in the non-market economy. *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999). Instead, Commerce seeks to identify and rely on the record data that "most accurately represents the fair market value" of the relevant factor of production. *Id.*

## III. Commerce's Calculation Methodology Of The Surrogate Inland Freight Rate Is Supported By Substantial Evidence And In Accordance With Law

Plaintiffs first challenge Commerce's calculation of the surrogate value for inland trucking freight rates. Pl. Br. at 5-15. They argue that: (1) the inclusion of an intra-city freight

rate in Commerce's calculation of inland freight is unsupported by substantial evidence, and (2) Commerce's calculation methodology incorrectly averages the inland freight surrogate value. However, substantial evidence supports Commerce's determination, and plaintiffs do not point to any legal authority supporting their purported calculation methodology or indicating that Commerce's calculation methodology is contrary to law or its practice.

### A. Commerce Reasonably Included St. Petersburg Frieght Rate Data In Its Inland Freight Calculation

Commerce valued Zhejiang Sanmei's foreign inland freight using a simple average of the two individual freight rates from the World Bank's report, *Doing Business Russia*. IDM at 42-43. Commerce routinely uses the World Bank's reports for determining surrogate values for freight. "The Doing Business Russia provides a publicly available, broad market average freight rate, and we have consistently found the Doing Business publication to provide the best available information in other prior cases to value inland freight." *Certain Fabricated Structural Steel from China*, 85 Fed. Reg. 5,376 (Dep't of Commerce Jan. 30, 2020) and accompanying IDM at 75. In this case, Commerce found that the report was the best available information because it satisfies Commerce's criteria, no parties challenged the use of the report, and no party provided alternative data. IDM at 43.

The World Bank report provides "case studies" showing the cost of shipping a standardized, 15 metric ton import or export from a given city to the relevant port or border. Zhejiang Sanmei's Initial Surrogate Value Submission (June 14, 2021) at Exhibit 5 (P.R. 170). For Russia, it includes case studies for both Moscow and St. Petersburg. *Id*. For Moscow, the report shows the cost to ship an export from Moscow to the port in St. Petersburg (724 km) and the cost to ship an import from Moscow to the Krasnaya Gorka border crossing in Smolenskaya Oblast (500 km). IDM at 43; *see also* Zhejiang Sanmei's Initial Surrogate Value Submission

(June 14, 2021) at Exhibit 5. For St. Petersburg, the report shows the cost to ship an export or import from St. Petersburg to St. Petersburg Port (8 km). IDM at 43; *see* also Petitioner's Initial Surrogate Value Submission at Exhibit SV-3.1 (P.R. 164-65). Commerce calculated the surrogate value for the inland freight rate by using the data from the report to calculate a rate for each city, and then taking the simple average of those rates. IDM at 43. The resulting surrogate value inland freight rate was calculated at $1.039 per metric ton per kilometer (MT/KM) for exports and $1.038/MT/KM for imports. *Id*.

Plaintiffs contend that Commerce should have used only the Moscow data, which plaintiffs refer to as "inter-city" freight data, and excluded the St. Petersburg data, which plaintiffs refer to as "intra-city" freight data. Pl. Br. at 8. Zhejiang Sanmei only incurred freight costs between Zhejiang Sanmei's factory and Wenzhou, the nearest international seaport, which is 187.2 km from the factory. *Id*. at 7. Plaintiffs claim that because this constituted "inter-city" freight, Commerce distorted the inland freight surrogate value calculation by including intra-city freight costs. *Id*. at 8.

However, Commerce was not required to distinguish between "intra-city" and "inter-city" freight rates rather than following its established practice of seeking data that represent a broad average price. The World Bank's report makes no distinction between inter-city and intra-city freight, nor does it give any other indication that the data from Moscow and St. Petersburg fall into distinct categories. *See* Petitioner's Surrogate Values Submission Part 2 at PDF 22-30 (P.R. 166). Rather, plaintiffs devised this distinction themselves to differentiate the more favorable Moscow data from the less favorable St. Petersburg data, and to argue only the Moscow data should be used.

Plaintiffs insist that "Commerce's surrogate valuation must be representative of the Respondents' experience in producing and selling the subject merchandise, which includes in this case, {} long distance inland freight expenses." *Id.* at 9. This is effectively an argument that Commerce must exclude any datapoint that does not reflect every aspect of Zhejiang Sanmei's experience. But as stated above, "while a surrogate value must be as representative of the situation in the {non-market economy} country as is feasible, Commerce need not duplicate the exact production experience of the Chinese manufacturers at the expense of choosing a surrogate value that most accurately represents the fair market value of {the factor of production} in a hypothetical market-economy China." *Nation Ford Chem. Co.*, 166 F.3d 1373, 1377 (cleaned up). If plaintiffs' argument were to prevail, any respondent in a less-than-fair value investigation could exclude any data they wished by finding some aspect of that data that differed from their particular circumstances. Commerce is not required to tailor the data to respondents' preferences in this manner. *See id.* (noting that the statute "'simply does not say—anywhere—that the factors of production must be ascertained in a single fashion'") (quoting *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed.Cir.1994)).

Commerce generally does exclude a value that it finds to be aberrational, but only if interested parties provide specific evidence demonstrating that the value is aberrational. IDM at 44; *see, e.g.*, *1-Hydroxyethylidene-1, 1-Diphosphonic Act from China*, 84 Fed. Reg. 67,925 (Dep't of Commerce Dec. 12, 2019), and accompanying IDM at Cmt. 8; *Steel Wire Garment Hangers from China*, 80 Fed. Reg. 13,332 (Dep't of Commerce Mar. 13, 2015), and accompanying IDM at Cmt. 5; and *Steel Propane Cylinders from China*, 84 Fed. Reg. 29,161 (Dep't of Commerce June 21, 2019), and accompanying IDM at Cmt 3; and *Certain Frozen Warmwater Shrimp from Vietnam*, 76 Fed. Reg. 56,158 (Dep't of Commerce Sept. 12, 2011) and

accompanying IDM at Cmt. 12. Plaintiffs have not provided such evidence with respect to the St. Petersburg data. Instead, they make the misguided argument that the St. Petersburg data must be aberrational because of the large difference between the St. Petersburg freight cost data and the Moscow freight cost data. Pl. Br. at 9-10. Plaintiffs emphasize the "great disparity" between the Moscow and St. Petersburg rates and assert that use of both rates therefore resulted in a "distortive or unrepresentative" freight rate. Pl. Br. at 8. They further contend that the calculated rate must be distorted because, by including the St. Petersburg data, Commerce "overstated Zhejiang Sanmei's margin by 216.9 percentage points." Pl. Br. at 9-10.

However, "Commerce has repeatedly found that the existence of high or low prices alone does not necessarily indicate that the price data is distorted or misrepresentative; thus, differences is pricing data is not a sufficient basis upon which to exclude a particular data point from the calculation of a {surrogate value}." IDM at 44. Instead, "parties must provide specific evidence that the value is aberrational." *Id.* Here, however, plaintiffs "merely cite{} to the fact that one rate is greater than another." *Id.* Plaintiffs' argument could just as easily support the conclusion that the Moscow data are aberrational because they are much different than the St. Petersburg data. Accordingly, they have failed to show that the St. Petersburg data are aberrational.

Moreover, Commerce found that Zhejiang Sanmei failed to show "that the short freight rate distances included in the *Doing Business Russia* average freight rate are not representative of its experience." IDM at 45. Plaintiffs have not pointed to evidence in the record to contradict that conclusion. Rather, plaintiffs' argument that the calculated freight rate is "distorted" or "overstated" because of the St. Petersburg data simply assumes that the Moscow data accurately reflect Zhejiang Sanmei's costs while the St. Petersburg data do not. However, plaintiffs provide

no basis for this assumption. They state that the Moscow data reflect freight distances of 500 and 724 km, the St. Petersburg data reflect freight distances of 8 km, and Zhejiang Sanmei's actual freight costs reflected distances of 187.2 km—a value in between. Plaintiffs attempt to create distinct "inter-city" and "intra-city" categories that would group Zhejiang Sanmei's freight costs with the Moscow data, but in fact there is no evidence to suggest that the Moscow data are more similar to Zhejiang Sanmei's costs.

Accordingly, plaintiffs fail to demonstrate how Commerce's inland freight calculation methodology was unsupported by substantial evidence, and Commerce's determination should therefore be sustained.

### B. Commerce Reasonably Relied On A Simple Averaging Methodology For Calculating Inland Freight

Plaintiffs also challenge Commerce's method of averaging the freight data from Moscow and St. Petersburg. They claim that it was incorrect for Commerce to take the simple average of the Moscow and St. Petersburg rates, and that Commerce should instead have weighted the averages.

However, Commerce's simple average methodology is consistent with prior practice that has been sustained by the Court. *See* IDM at 47 n. 304 (citing *Zhejiang Native Produce & Animal By-Products Imp. & Exp. Corp. v United States*, 28 C.I.T. 1427 (Ct. Int'l Trade 2004) (holding that Commerce's simple averaging of raw honey prices to calculate a surrogate value for raw honey was reasonable and supported by the record), *rev'd on other grounds*, *Zhejiang Native Produce & Animal By- Products Imp. & Exp. Corp. v United States*, 432 F.3d 1363 (Fed. Cir. 2005); *Rhodia, Inc. v. United States*, 1185 F. Supp. 2d 1343, 1350 (Ct. Int'l Trade 2001) (remanding to Commerce because Commerce failed to explain why it was reasonable to depart from its normal practice of applying a simple average to surrogate values); *Fuyao Glass Ind.*

*Group Co., Ltd. v. United States*, 27 C.I.T. 1892, 1924 (Ct. Int'l Trade 2003) (upholding Commerce's decision to use the simple average of country-wide state electricity rates as a surrogate value for Chinese electricity rates)). Here, as plaintiffs acknowledge, Commerce first calculated the freight rate in U.S. dollars per metric ton per kilometer (USD/MT/KM) for each city's data. Pl. Br. at 12. Then, it took the simple average of the two resulting rates. *See* Preliminary Surrogate Value Memorandum (Aug. 10, 2022) at 9-10, unchanged in the *Final Determination*. This resulted in an average USD/MT/KM value for the freight rate, which Commerce used to value the subject merchandise.

Plaintiffs assert that to "properly" calculate an average USD/MT/KM freight rate, Commerce was required to take the weighted average cost of the St. Petersburg case study and the Moscow case study. Specifically, plaintiffs contend that Commerce should have averaged the costs of both case studies, averaged the volume of both case studies, and averaged the distance of both case studies, and then used the three averaged variables to determine the cost per metric ton per kilometer. Pl. Br. at 12. Commerce, however, "{did} not find {Zhejiang Sanmei's} preferred methodology to be more accurate or reliable to calculate the truck freight {surrogate values}." IDM at 46. Now, plaintiffs still do not explain why a weighted average is required, or why a simple average is unacceptable. As was the case during the administrative proceedings, they "fail{} to explain why the simply-average methodology is logically or mathematically incorrect, other than to point out that the freight rates and dumping margins are higher than if we were to use {Zhejiang} Sanmei's preferred methodology." IDM at 46. They assert that Commerce, by choosing a different methodology, "overstated the weighted average USD/MT/KM export freight." Pl. Br. at 13. However, "a methodology is not mathematically incorrect simply because it produces a larger or smaller result." IDM at 46. The Court should

not substitute its judgment for that of Commerce in choosing between two possible calculation methods, even if it could justify having made a different choice had the matter been before it *de novo*. *Goldlink Indus. Co.*, 431 F. Supp. 2d 1323, 1326. And in this case, where plaintiffs have not even attempted to explain why Commerce's methodology is flawed or why their methodology is superior, there is no basis for the Court to reject Commerce's judgment.

Moreover, because the two rates in the World Bank's report are representative case studies showing the typical cost of shipping a 15 metric ton shipment—rather than datasets of real-world shipments—plaintiffs are effectively saying that Commerce should have weighted the data based on the average distance of a single example shipment from each city. There is no logical reason that this would be appropriate, and plaintiffs provide no justification beyond the repeated assertion that this method is correct.

Finally, Commerce did not "use different methodologies to calculate the same surrogate freight rates at different points in the same investigation," as contended by plaintiffs. Pl. Br. at 13. Rather, petitioner used a weighted average in some of its submissions, and Commerce simply stated in its Antidumping Duty Investigation Initiation Checklist, citing petitioner's submissions, that "the petitioner provided dumping margins based on price-to-NV comparisons. The estimated dumping margins range from 149.09 percent to 238.83 percent." P.R. 35 at 8. The fact that petitioner used a particular methodology to estimate a dumping rate, or that Commerce acknowledged petitioner's calculated rate before conducting its investigation, does not mean Commerce adopted that rate or was bound by that methodology. And in any case, as Commerce has explained, the standard for initiating an investigation does not require Commerce to use the best available information. IDM at 47. Initially, "Commerce will typically use the information contained in the petition, as provided by the petitioner, and without modification, as

long as the petitioner's calculations are reasonable and the best information reasonably available to it." *Id.* However, "Commerce is not prevented from using a better calculation for the respondent's actual margin calculations during the actual investigation." *Id.*

Accordingly, plaintiffs have identified no reason to disturb Commerce's determination, which is reasonable and supported by substantial evidence.

## IV. Commerce Reasonably Chose To Directly Value The Intermediate Input AHF

During a less-than-fair value investigation, Commerce requests information about respondents' factors of production in order to determine the actual cost of inputs, permitting Commerce to calculate an accurate dumping margin in accordance with § 1677b(c)(1)(b). "The statute 'accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines'; indeed, the Court of Appeals has 'specifically held that Commerce may depart from surrogate values when there are other methods of determining the 'best available information' regarding the values of the factors of production.'" *Zhengzhou Harmoni Spice Co. v. United States*, 33 Ct. Int'l Trade 453, 459-460, 617 F. Supp. 2d 1281, 1290 (2009) (quoting *Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1381 (Fed. Cir. 2001)).

When calculating the value of intermediate inputs—inputs produced by a respondent from upstream factors of production, and in turn used to produce the subject merchandise— Commerce usually does so by valuing the upstream inputs. However, Commerce sometimes departs from this standard methodology and instead values the intermediate input directly. *See Xanthan Gum from China,* 80 Fed. Reg. 29,615 (Dep't of Commerce May 22, 2015), and accompanying IDM at Cmt. 1 (citing *Drill Pipe from China*, 76 Fed. Reg. 1,966 (Jan. 11, 2011), and accompanying IDM at Cmt. 12). Commerce has used this methodology:

> (1) when a "respondent may report factors used to produce an intermediate input that accounts for an insignificant share of the total output," (2) when the burden associated with calculating each factor outweighs the potential increase of calculation accuracy, or (3) when valuing the factors of production associated with producing the intermediate input would result in inaccurate calculations because Commerce is unable to value a significant cost in the overall factors buildup.

*Linyi Chengen Imp. & Exp. Co. v. United States*, 487 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2020) (quoting IDM).

Here, anhydrous hydrofluoric acid (AHF) is an intermediate input Zhejiang Sanmei uses to produce the subject merchandise. PDM at 33. Plaintiffs argue that Commerce should calculate the value of AHF by valuing the upstream factors of production Zhejiang Sanmei used to produce AHF.

However, for several reasons Commerce was unable to substantiate Zhejiang Sanmei's reporting of the upstream inputs in AHF using the record evidence. As an initial matter, the record evidence shows that Zhejiang Sanmei purchases AHF from affiliated and unaffiliated Chinese suppliers. IDM at 22; *see also* PDM at 34 ("as each intermediate input and product appears to have its own workshop, but no further distinction is made as to whether there are separate storage facilities for AHF purchased from Chinese suppliers."). To the extent that Zhejiang Sanmei was using purchased rather than self-produced AHF, it would not be an intermediate input and it would not be accurate to value it based on upstream factors of production. Accordingly, because Commerce found there was "no record evidence demonstrating how {Zhejiang} Sanmei differentiates between the production of AHF and purchases of AHF," it concluded that it was most appropriate to value AHF directly. IDM at 22; *see also* PDM at 34 (explaining that "each intermediate input and product appears to have its own workshop, but no further distinction is made as to whether there are separate storage

facilities for AHF purchased from Chinese suppliers."). Commerce also found that Zhejiang Sanmei failed to provide sufficient evidence to track the types of AHF it reportedly sold in China, and that by-products produced by Zhejiang Sanmei while manufacturing AHF did not reconcile with the total raw materials consumed. *See* IDM at 22; PDM at 34. Zhejiang Sanmei argued that it produced enough AHF to produce all of its R-125, but Commerce explained that "even if {Zhejiang} Sanmei produced more AHF than it consumed in the production of R-125, the record still indicates that there were other types of AHF available and used on {Zhejiang} Sanmei's premises, but the extent of their use is not documented." *Id*. In other words, even if self-produced AHF was available, that does not mean that Zhejiang Sanmei used that self-produced AHF to produce the subject merchandise.

Plaintiffs argue that it should not matter whether Zhejiang Sanmei distinguished between self-produced and purchased AHF, because Commerce ultimately calculated the U.S. price of the subject merchandise using only sales of subject merchandise by Zhejiang Sanmei's affiliate, Fujian Qingliu. Pl. Br. at 16. Plaintiffs state that Fujiang Qingliu had no purchases of AHF during the period of investigation, and instead self-produced all its AHF consumption. *Id*. at 17. Consequently, plaintiffs argue that Commerce should value AHF by valuing Fujiang Qingliu's reported factors of production. *Id*.

However, Commerce determined necessary factors of production information for Fujiang Qingliu were not available on the record. IDM at 35. When necessary information is not available on the record Commerce selects from "facts otherwise available" in order to fill the gaps in the record. 19 U.S.C. § 1677e(a). In this case, Fujiang Qingliu "does not measure its water consumption, which is a significant cost element with a tremendous impact on yield loss and by-product production." IDM at 23-24. Zhejiang Sanmei has acknowledged the importance

of water in producing AHF and the fact that Fujiang Qingliu does not measure water consumption. IDM at 23 & notes 133-34 (citing Zhejiang Sanmei's administrative case brief). Zhejiang Sanmei reported its own water usage as a surrogate value for Fujiang Qingliu's, and also reported that the two producers use different manufacturing processes. IDM at 23. Accordingly, Commerce relied on the Zhejiang Sanmei's production process and reported consumption of water as a direct input as facts otherwise available, in accordance with 19 U.S.C. § 1677e(a). IDM at 35. Because it was relying on Zhejiang Sanmei's production process, and because Zhejiang Sanmei did not provide evidence that it distinguishes its self-produced AHF from purchased AHF, Commerce valued the AHF directly. IDM at 23.

Zhejiang Sanmei suggested Commerce use Zhejiang Sanmei's water usage as a surrogate value for Fujian Qingliu's water usage but otherwise rely on Fujian Qingliu's reported data and production process. However, given that Zhejiang Sanmei had a different manufacturing process, Commerce ultimately rejected this method of mixing and matching inputs from Zhejiang Sanmei and Fujian Qingliu as "convoluted and not based on {Fujiang} Qingliu's or {Zhejiang} Sanmei's own experience." IDM at 23.

Further, Commerce concluded that it could not reliably value the upstream factors of production for AHF produced by Zhejiang Sanmei or Fujiang Qingliu because neither producer tracks its yield loss for those factors of production in the normal course of business. Commerce must be able to substantiate the yield loss from the upstream inputs in order to corroborate the reported input and output quantities using data that reflect actual conditions and variations of the production process. However, Commerce found that Zhejiang Sanmei did "not provid{e} evidence for how {Zhejiang} Sanmei accounts for the yield loss from these inputs in the consolidated {factors of production} database" and that "the by-products reportedly produced

while manufacturing AHF do not reconcile with the total raw materials consumed for {the upstream factors of production}." IDM at 22. Commerce issued "product specific and stage specific" requests for yield loss information, which included a request for calculations as well as "supporting documentation for yield loss at every stage." IDM at 23, 29 n. 182. Instead, Zhejiang Sanmei merely provided a formula, which it did not use in the ordinary course of business, for calculating total yield loss "based purely on the inputs and outputs, without regard to reactions {of the various chemical formulas}." IDM at 29 n.182. Accordingly, Commerce reasonably determined that Zhejiang Sanmei did not accurately report or substantiate the consumption of upstream material inputs used in the production of AHF. *Id.*

In any case, plaintiffs fail to demonstrate that Fujiang Qingliu used only self-produced AHF. Their argument rests on the fact that "the trial balance of AHF finished goods debit quantity...is equal to the production of AHF by Qingliu." Pl. Br. at 17 (citing Zhejiang Sanmei Section D Response at Exhibit VI-6 (C.R. 102) (Fujiang Qingliu's trial balances); Zhejiang Sanmei Supplemental Section D Response at Exhibit SD-18 (C.R. 131) (Fujiang Qingliu's reported AHF production)). They appear to be suggesting that because one of Fujian Qingliu's trial balance sheets—the trial balance for its "finished goods"—shows a "debit quantity" of AHF equal to the reported amount of AHF produced by Fujian Qingliu, the entire produced amount must have been used to produce subject merchandise. However, it is not clear that the "debit quantity" refers specifically to AHF used to produce subject merchandise. In addition, even if the amount of AHF used to produce subject merchandise was equal to the AHF self-produced, that would not demonstrate that Fujian Qingliu necessarily used only self-produced AHF to produce subject merchandise. For instance, Fujian Qingliu might have self-produced AHF in specific quantities to replace purchased AHF used to produce subject merchandise. Further,

Exhibit SD-18, which plaintiffs rely on to show the total quantity of AHF produced by Fujian

Qingliu during the period of investigations, is a worksheet that was completed for this

investigation, not a document kept in the ordinary course of business. Accordingly, plaintiffs fail

to show that the record demonstrates that all AHF used for production of subject merchandise

was necessarily self-produced by Fujiang Qingliu.

Plaintiffs continue to contend that Commerce should simply calculate total yield loss

"based upon the quantities of the inputs and outputs." Pl. Br. at 17. However, the purpose of

requesting information regarding Zhejiang Sanmei's yield loss is to use that information to

*substantiate* the reported input and output quantities; deriving that yield loss information *from*

those quantities defeats the purpose of the inquiry. Commerce determined that the data and

calculations provided by Zhejiang Sanmei were provided outside of the ordinary course of

business and not based on actual information. IDM at 23. Thus, Commerce reasonably found

that Zhejiang Sanmei failed to provide evidence of the actual yield loss that would allow

Commerce to substantiate the reported upstream inputs for AHF. *Id.*

## V.      Commerce Reasonably Denied Zhejiang Sanmei A By-Product Offset

When calculating the normal value of subject merchandise by valuing of the factors of

production, Commerce may offset that normal value to account for the value of by-products

created during the production process. Specifically, it will grant an offset "for sales of

byproducts generated during the production of subject merchandise, if the respondent can

demonstrate that the by-product is either resold or has commercial value and re-enters the

respondent's production process." *Arch Chems., Inc. v. United States*, 33 C.I.T. 954, 956 (2009).

Respondent bears the burden of "substantiat{ing} by-product offsets by providing {Commerce}

with sufficient information to support its claims." *Id*.; 19 C.F.R. § 351.401(b)(1)-(2).

Commerce only grants an offset for the amount of scrap that it determines was actually generated through production of the subject merchandise during the period of investigation. *See Am. Tubular Prod., LLC v. United States*, 847 F.3d 1354, 1361 (Fed. Cir. 2017) ("{a}bsent evidence linking the scrap sold with any scrap generated resulting from the production of {subject merchandise} during the period of review, Commerce properly found that Chengde's submissions were insufficient and properly denied the requested offset"); *Juancheng Kangtai Chem. Co. v. United States*, No. 14-56, 2015 WL 4999467, at *40 (Ct. Int'l Trade Aug. 21, 2015) ("Commerce has described its normal by-product offset practice as limited to the total production quantity of the by-product . . . produced during the {period of review}.") (quotation omitted).

Here, Commerce denied Zhejiang Sanmei a byproduct offset for four byproducts created during the production of AHF and R-125—fluosilicic acid, fluorine gypsum, hydrochloric acid, and R-134a—because it found "insufficient evidence to corroborate the volume of by-products generated in the production of subject merchandise and whether the sales of by-products included quantities generated in the production of non-subject merchandise or from other purchases." IDM at 29. In other words, Zhejiang Sanmei failed to meet the requirements of showing that actual sales of byproducts could be traced to the actual production of those byproducts through production of subject merchandise during the period of review.

With respect to the two byproducts of AHF, Commerce could not substantiate Zhejiang Sanmei's claimed offsets because, as explained above, it could not substantiate how much self-produced AHF, as opposed to purchased AHF, was used to produce the subject merchandise. IDM at 29. Accordingly, Zhejiang Sanmei failed to demonstrate what portion of AHF byproduct was the result of production of subject merchandise. *Id.* As also explained above, Zhejiang

Sanmei and Fujian Qingliu did not track yield loss at each stage of production of subject merchandise, and Fujian Qingliu did not track water usage. *See* IDM at 22-23. Each of these issues further prevented Commerce from reliably verifying the reported byproducts for which Zhejiang Sanmei claims an offset. Because Commerce could not confirm the yield loss at each stage of production, it could not reliably confirm the quantity of byproduct that would ultimately be produced for either AHF or the subject merchandise. With respect to water, Zhejiang Sanmei emphasized that "{w}ater is an important factor in the production of both AHF and R-125 and has a tremendous impact on…by-product production." IDM at 29-30 (citing Zhejiang Sanmei's administrative case brief). Without record information concerning Fujian Qingliu's water usage, Commerce could not substantiate Fujian Qingliu's byproduct production for AHF. *See id.*

Further, with respect to the claimed offset for hydrochloric acid byproduct, although Zhejiang Sanmei provided records from its warehouse purporting to show the quantity of hydrochloric acid produced from the R-125 workshop, Commerce concluded that it could not determine from those records how much of the hydrochloric acid ultimately sold or used was actually a by-product of production of subject merchandise. IDM at 30. Zhejiang Sanmei admits that "{t}he ultimate sale and shipment of hydrochloric acid by-product is just mixed together without distinction of source." *Id.* (quoting Zhejiang Sanmei's Supplemental Section D Response, Jul. 26, 2021 (P.R. 198, C.R. 127) at 5-6). It argued that Commerce could substantiate the quantity of hydrochloric acid by-product produced in the subject merchandise workshop, but Commerce found that "the information provided in the warehouse-in records and the screen shots of the warehouse management system do not appear to account for and demonstratively show a difference between production records in the R-125 and non-subject merchandise workshops." IDM at 30. Further, even if Zhejiang Sanmei could show that a

certain quantity of hydrochloric acid entered its warehouse from the R-125 workshop, this would be insufficient unless it could also show how much of *sales* could be traced to the R-125 workshop, yet Zhejiang Sanmei admits the sold hydrochloric acid is not distinguished by source. Accordingly, Commerce concluded that "Sanmei's arguments fail to demonstrate that it can adequately track production *and sales* of hydrochloric acid." IDM at 30 (emphasis added).

Finally, with respect to the claimed offset for R-134a byproduct, Commerce found that record evidence failed to substantiate the offset for several reasons. Commerce found that "the record remains unclear as to the processing that R-134a undergoes prior to introduction in non-subject merchandise or when it is sold." IDM at 30 (citing Zhejiang Sanmei SDQR at 4 and Exhibit SD-13). Accordingly, Commerce could not substantiate the degree of processing that occurred between production and sale or use of the byproduct, which could affect the reported quantities. Further, Commerce found that Zhejiang Sanmei "failed to provide adequate records for tracking production and sales of R-134a" because it provided "no supporting documents for warehouse-in records." IDM at 30. In addition, Commerce explained that "without proper warehouse-in documentation, it is unclear if {Zhejiang} Sanmei or {Fujiang} Qingliu are able to distinguish R-134a resulting from the production of R-125 or purchases from affiliated or unaffiliated parties." *Id.* at 31.

For these reasons, substantial evidence supports Commerce's conclusion that Zhejiang Sanmei failed to meet its burden to provide Commerce with information that would substantiate an offset for byproducts. *See Am. Tubular Prod.*, 847 F.3d at 1361; 19 C.F.R. § 351.401(b)(1)-(2). Accordingly, Commerce's denial of a byproduct offset should be sustained.

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motion for

judgment on the administrative record and sustain Commerce's final determination.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Kelly Geddes
Kelly Geddes
Trial Attorney
U.S. Dept. of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Telephone: (202) 307-2867
E-mail: Kelly.Geddes2@usdoj.gov

OF COUNSEL:
JESUS N. SAENZ
Attorney
Office of the Chief Counsel
    for Trade Enforcement and Compliance
U.S. Department of Commerce
Washington, D.C.

February 21, 2023

Attorneys for Defendant

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel certifies that defendant's motion in this matter complies with the Court's type-volume limitation rules. According to the word count calculated by the word processing system with which the motion was prepared, the brief contains a total of 6727 words.

/s/ Kelly Geddes

February 21, 2023