UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: Hon. Richard K. Eaton, Judge**

| | |
|---|---|
| ZHEJIANG SANMEI CHEMICAL IND. CO., LTD., SHANDONG DONGYUE CHEMICAL CO., LTD., and HUANTAI DONGYUE INTERNATIONAL TRADE CO., LTD. | |
| Plaintiffs, | Court No. 22-00103 |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |
| | **PUBLIC VERSION** |

**REPLY BRIEF**

Lizbeth R. Levinson
Brittney R. Powell

FOX ROTHSCHILD LLP
2020 K Street, NW
Suite 500
Washington, DC  20006
 Phone:  (202) 461-3100
 Email: llevinson@foxrothschild.com

April 3, 2023

## **TABLE OF CONTENTS**

I.   THE GOVERNMENT HAS NOT ESTABLISHED THAT COMMERCE'S SELECTION OF A SURROGATE FREIGHT RATE WAS SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD. ......................................................... 1

    A.   Commerce's Inclusion of the St. Petersburg Freight Rate Data in its Inland Freight Calculation for Both Import and Export Transactions was Unreasonable................................................................................................................. 1

    B.   Commerce Incorrectly Calculated the Inland Freight Surrogate Value by Using a Simple Averaging Method for Calculating Inland Freight........................ 8

II.  COMMERCE IMPROPERLY VALUED THE INTERMEDIATE INPUT ANHYDROUS HYDROFLUORIC ACID (AHF)............................................................. 12

    A.   The Administrative Record Establishes that All Sales of Subject Merchandise Were Self-Produced by Sanmei's Production Affiliate Fujian Qingliu................ 12

    B.   Zhejiang Sanmei's Provided Sufficient Information to Calculate Water Consumption and Yield Losses  for Fujian Qingliu. .............................................. 13

        1.   Water Consumption ................................................................................. 14

        2.   Yield Loss ................................................................................................ 16

III. COMMERCE'S DECISION TO DENY ZHEJIANG SANMEI A BY-PRODUCT IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.................................................... 17

IV.  CONCLUSION.................................................................................................................. 21

143958261.2

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Action Committee v. United States*,
219 F. Supp. 3d. 1286, 1291 (2017) .........................................................................2

*Blue Field Food Industry Co., Ltd. v. U.S.*,
949 F. Supp. 2d 1311 (Ct. Int'l Trade November 2013)...........................................2

*Canadian Solar International Limited v. United States*,
532 F. Supp.3d 1273 (Ct. Int'l Trade July 2021)......................................................2

*Horne Meridian Int'l, Inc. v. Great Rich (HK) Enterprises Co., Ltd.*,
Slip Op. 13-81 at 7 (CIT June 2013)........................................................................9

*Lasko Metal Products, Inc. v. United States*,
801 F.Supp. 314 (Ct. Int'l Trade 1992) ...................................................................8

*Linyi Chengen Imp. & Exp. Co. v. United States*,
487 F.Supp.3d 1349, 1355 (Court of Inter'l Trade 2020)......................................15

*Mittal Steel Galati S.A. v. U.S.*,
502 F. Supp. 2d 1295 (Ct. Int'l Trade July 2007)....................................................6

*National Ford Chemical Co. v. U.S.*,
166 F. 3d 1373 (Fed. Cir. February 1999) .......................................................3, 5, 8

*Peer Bearing Co.-Changshan v. United States*,
752 F.Supp.2d 1353 (Ct. Int'l Trade Jan. 2011) ..................................................6, 7

*Rhodia, Inc. v. United States*,
1185 F. Supp. 2d 1343 (Ct. Int'l Trade 2001) ...................................................10, 11

*Shakeproof Assembly Components, Div. of Ill. Toolworks, Inc. v. United States*,
268 F.3d 1376 (Fed. Cir. 2001)...........................................................................8, 12

*Tri Union Frozen Products, Inc. v. United States*,
227 F. Supp. 3d 1387 (Ct. Int'l Trade June 2017) ...................................................3

*Xinjiamei Furniture Co. v. United States*,
Slip Op. 13-30, 2013 WL 920276 (Ct. Int'l Trade Mar. 2013) ...............................6

*Zhejiang Native Produce and Animal By-Products Imp. and Exp. Corp. v. United States*,
28 C.I.T. 1427 (CIT 2004)......................................................................................10

143958261.2

**Statutes**

19 U.S.C. § 1677b(c) (2015)...........................................................................................8

19 U.S.C § 1677b(c)(1)...................................................................................................2

**Other Authorities**

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (Dep't
    Commerce May 19, 1997) ........................................................................................3

*Certain Fabricated Structural Steel from the People's Republic of China: Final
    Affirmative Determination*, 85 Fed. Reg. 5376 (Jan. 30, 2022)...............................12

*Certain Polyester Staple Fiber from the People's Republic of China: Final Partial
    Affirmative Determination,* 72 Fed. Reg. 19690 (April 19, 2007).........................11

*Fresh Crawfish Tail Meat from the People's Republic of China Issues and
    Decision Memorandum for the Final Results of Antidumping Duty
    Administrative Review of Freshwater Crawfish Tail Meat from the People's
    Republic of China: Review and Rescission of Review in Part,* 74 Fed. Reg.
    6571 (Feb. 10, 2009) ..............................................................................................11

*Horne Meridian International, Inc.*, Slip Op. 13-81 at 7............................................12

*Issues and Decision Memorandum for the Final Affirmative Determination in the
    Less-Than-Fair-Value Investigation of Certain Fabricated Structural Steel
    from the People's Republic of China* (Dep't of Commerce January 2020)..............................4

*Notice of Final Determination of Sales at Less than Fair Value: Bicycles from the
    People's Republic of China*, 61 Fed.Reg. 19,026, 19,039 (Dep't of Commerce
    April 30, 1996).......................................................................................................11

Rule 56.2......................................................................................................................21

World Bank's Report: (1) ...............................................................................................1

143958261.2

**REPLY BRIEF OF PLAINTIFF ZHEJIANG SANMEI CHEMICAL IND. CO. LTD**

Plaintiff Zhejiang Sanmei Chemical Ind. Co. Ltd. ("Zhejiang Sanmei") respectfully submits this reply to the response briefs filed by the Defendant United States ("the Government") and by Defendant-Intervenor Honeywell International Inc.  ("Defendant-Intervenor") on February 21, 2022.  For the reasons stated below, Defendant and Defendant-Intervenor have failed to establish that this Court should uphold the Department of Commerce's methodology as supported by substantial evidence on the record.

**I.      THE GOVERNMENT HAS NOT ESTABLISHED THAT COMMERCE'S SELECTION OF A SURROGATE FREIGHT RATE WAS SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD.**

**A.      Commerce's Inclusion of the St. Petersburg Freight Rate Data in its Inland Freight Calculation for Both Import and Export Transactions was Unreasonable**

The Government claims that "Commerce reasonably calculated the surrogate inland freight rate by using all available data from the World Bank's Report, Doing Business Russia." Government's Brief at 4.    To calculate the surrogate inland freight rate for export transactions, Commerce averaged two type of freight rates found in the World Bank's Report: (1) the freight rate from Moscow to the port of St. Petersburg, and (2) the freight rate for transport from the metropolitan area of St. Petersburg to the port of St. Petersburg.  To calculate the surrogate inland freight rate for import transactions, Commerce averaged the following two types of freight rates also found in the World Bank's report: (1) the freight rate incurred on inport transactions from the eastern Russian land border to Moscow, and; (2) the freight rate from the St. Petersburg port to St. Peterburg city.   For both import and export transactions, the latter (i.e. the freight rate between St. Petersburg and its port) should have been disregarded as aberrational in that it that sharply and unreasonably inflated the surrogate value for the long-haul transport undertaken by

Zhejiang.   Zhejiang Sanmei did not incur any intra-city freight costs.   The freight incurred by Zhejiang Sanmei for both import and export transactions that the surrogate value was meant to approximate was strictly long-haul in nature. [1]

It is axiomatic that 19 U.S.C § 1677b(c)(1) requires that Commerce's valuation of factors of production must be based on the best available information.   The court will uphold Commerce's surrogate value choices if the agency fairly considered record evidence when choosing surrogates, so that a reasonable mind could accept Commerce's findings.   *Blue Field Food Industry Co., Ltd. v. U.S.*, 949 F. Supp. 2d 1311, 1326 (Ct. Int'l Trade November 2013).   In this case, inclusion of the more expensive per unit, short distance, intra-city St. Petersburg freight rates in the simple-average freight calculations for both import and export data points, severely and unrealistically distorted the surrogate USD/MT/KM freight rate.

It is Commerce's practice not to use aberrational values as surrogate values.   *See Canadian Solar International Limited v. United States*, 532 F. Supp.3d 1273, 1278 (Ct. Int'l Trade July 2021) (stating it is Commerce's practice to avoid using aberrational values as surrogate values); *Blue Field Industry Co.*, 949 F. Supp. 2d at 1317 (stating that aberrational data is not best available information); *Ad Hoc Shrimp Trade Action Committee v. United States,* 219 F. Supp. 3d. 1286, 1291 (stating that Commerce has acknowledged that aberrational values

---

[1] The administrative record establishes that the distance between Zhejiang Sanmei's factory and Wenzhou, the international seaport nearest to Sanmei's factory from which its merchandise was shipped, was 187.2 kilometers.  *See* Zhejiang Sanmei's Section D response at p. 19; P.R. # 3.  In contrast, the intra-city freight rate within St. Peterburg on which Commerce relied for the cost of transporting merchandise from St. Petersburg city to St. Petersburg port, a distance of only 8 kilometers.  Petitioner's First Surrogate Value Comments at Exhibit 3.1; PR 166; Appx Tab 7.

should not be used).  The Court has upheld Commerce's definition of aberrational as an "extreme outlier, distorted or misrepresentative, or somehow incorrect." *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997); *see also Tri Union Frozen Products, Inc. v. United States*, 227 F. Supp. 3d 1387, 1394 (Ct. Int'l Trade June 2017).

The Government claims as significant the fact that the World Bank's Report does not explicitly state that there is a difference between inter-city and intra-city freight transport rates. Mere observation and the application of common knowledge reveal that short-term freight rates are more expensive per unit.   The World Bank was not required to explicitly label these as inter- and intra-city transport given that the inland freight from Moscow to St. Petersburg port obviously involves traversing a large distance from one city to another, while the transportation from St. Petersburg to its port is a short distance within the confines of the same city area.

Importantly, the record shows that the distance from Zhejiang Sanmei's factory to Wenzhou, the closest international seaport, was 187.2 KM.  *See Zhejiang Sanmei's Section D* response at 19; P.R. # 149; Appx. Tab.  Consequently, Zhejiang Sanmei's inland fright expenses for both import and import transaction were limited to only long-distance shipping costs.   No reasonable mind would liken transport within a city (i.e. the intra-city St. Petersburg freight rates) to transport between two cities (for export transactions) separated by a significant distance; nor would such a mind consider a 187.2 KM a short freight rate distance.   Commerce is bound by *Nation Ford Chemical* to "be as representative of the situation in the NME country as is feasible" and to choose a surrogate value "that most accurately represents the fair market value," even if it is not required to duplicate the exact production experience of Zhejiang Sanmei. *National Ford Chemical Co.  v. U.S.*, 166 F. 3d 1373, 1377-1378 (Fed. Cir. February 1999).

3

Here, the surrogate value that would be most representative of Zhejiang Sanmei's costs for transport would be the freight rate cost data from Moscow to St. Petersburg port, since the data involved similar long-distance, inter-city freight travel.

Though it is true that 187.2 KM is less than the 724 KM (*i.e.* the distance from Moscow to St. Peterburg used for export transactions) and 500 KM (the distance from the eastern border to Moscow, used for import transactions), the circumstances are what causes the Moscow data to be more representative of Zhejiang Sanmei's situation.  Zhejiang Sanmei's factory is clearly not within the same city as Wenzhou, unlike St. Petersburg and its port.  Indeed, like the freight moving between Moscow and St. Petersburg port, it must traverse a large distance between cities, with all the time and resources that such transportation would require.

Commerce wrongly continues to contend that Zhejiang Sanmei has failed to offer up any evidence that short freight rate distances are not representative of its experience.  Defendant's Br. at 11.  But the record clearly shows that Zhejiang Sanmei's use of inland freight is to and from Wenzhou, and thus it engages solely in long distance, inter-city transportation of goods.  Commerce itself has noted that "long-haul trucking and short-haul trucking require very different assumptions," that it is the fixed costs "relating to loading, unloading, and traveling within the urban environment that increases the cost per kilometer of short-haul trucking," and that values are representative of the separate experiences they reflect.  *Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Fabricated Structural Steel from the People's Republic of China*, at Comment 4 (Dep't of Commerce January 2020).[2]  Therefore, to continue to apply the short distance, intra-city inland

_____

[2]  In that case, Commerce ultimately determined that the inclusion of the St. Petersburg data of 8 KM was not aberrational, noting in part that the respondent failed to show how the data was aberrational and that the distance for St. Petersburg was a close representation to the distance one of the respondents use to

freight rate from St. Petersburg to St. Petersburg port, would not only be unrepresentative of Zhejiang Sanmei's situation, but it also does not accurately represent the fair market value of the type of inland freight that Zhejiang Sanmei employs.  *See National Ford Chemical Co.*, 166 F.3d 1377-1378 (Fed. Cir. 1999).

This can be seen in the distortive effects the freight rate cost data from St. Petersburg to its port had on Zhejiang Sanmei's preliminary margin.  As stated in Zhejiang Sanmei's initial brief, the intra-city St. Petersburg freight rate for both export and import transactions was 2.050 USD/MT/KM (USD 245 / 15 MT / 15 KM = 2.050 USD/MT/KM).  Pl. Br. at 11 (*citing* Preliminary Surrogate Value Memo at Exhibit 8, supra; Appx. Tab 8).  In stark contrast, the Moscow long-distance export distance (Moscow to St. Petersburg) was equal to 0.088 USD/MT/KM (USD 958 / 15/MT / 724 KM = **0.088** USD/MT/KM). *Id.* Further, the Moscow long-distance import datapoint (Russian Western Border to Moscow) was equal to **0.087** US$/MT/KM ($660 / 15 MT / 500 KM = **0.0870** US$/MT/KM. Id.  Therefore, the intra-city freight rate was more than 23 times greater than either of the two calculated Moscow long-distance freight rates.  If Commerce had excluded this short-distance St. Petersburg freight distances in the calculation of the inland freight surrogate value, Zhejiang Sanmei's preliminary margin would have been 64.54%, a difference of 216.9 percentage points from the 280.73 percent margin Commerce applied.  Zhejiang Sanmei Significant Ministerial Error Allegation

---

transport goods from the warehouse to the port and thus "was an accurate reflection of the inland freight expenses one of the respondents is likely to incur." *Id.* at Comment 5.  That is not the case here. Zhejiang Sanmei is engaged in only long-distance inland freight, and thus the inclusion of this data is not an accurate reflection of the expenses it is likely to occur.  Further, the data, when applied to Zhejiang Sanmei, is aberrational since it is both misrepresentative of Zhejiang Sanmei's situation and distortive of the surrogate value and margin.  *See id.*

dated August 17, 2021; P.R. #234; Appendix Tab 9 at 5.  Such a drastic difference in the applied margin due to the inclusion of the St. Petersburg freight rate data shows the clear distortive impact of this data.

The Court has consistently shown concern for surrogate values drawn from data with larger price differences.  *See Xinjiamei Furniture Co. v. United States,* Slip Op. 13-30, 2013 WL 920276, at *1, *7 (Ct. Int'l Trade Mar. 2013) (remanding Commerce's selection of a surrogate value that was three times higher than others on the record); *Peer Bearing Co.-Changshan v. United States*, 752 F.Supp.2d 1353, 1369-1374 (Ct. Int'l Trade Jan. 2011) (remanding Commerce's choice of surrogate value four times higher than others on the record, and remanding a different surrogate value when it was 60% higher than the rest); *Mittal Steel Galati S.A. v. U.S.*, 502 F. Supp. 2d 1295, 1306-1308 (Ct. Int'l Trade July 2007) (remanding a surrogate value selection choice that was ten times higher than those of other countries).

 In *Peer Bearing Co*., *supra*. the court found that there was an enormous disparity between the value for the merchandise shown in the Indian import data and the values shown in all the other information on the record.  *Peer Bearing Co.-Changshan*, 752 F. Supp. 2d. at 1372. Indeed, Commerce made similar arguments in that case, "stating that higher prices alone did not necessarily indicate that price data was distorted or misrepresented," and that the plaintiff had not demonstrated why the data was unreliable.  *Id*. at 1374.  However, the Court found that a fairer characterization would recognize it "as a substantially higher price that is not corroborated by the other evidence on the record" and that "a disparity of this size calls into serious question" that the data was the best available information on the record before the Department.  *Id*. at 1371, 1374.  Likewise, here, the price of the inland freight rates between St. Petersburg and its port was 23 times greater than those between Moscow and St. Petersburg port and resulted in a 216.9

percent difference in the ultimate margin, an even higher price disparity than in *Peer Bearing*. *See id*. at 1369-1374.  Though it may be true that *Peer Bearing* involved the use of data from multiple countries, where one country's data was misrepresentative and distortive, the same logic applies to the inclusion of the misrepresentative St. Petersburg inland freight rate data.  *See id*. The vast difference between the prices of the inland freight rates when combined with the short-distance, inter-city nature of the inland freight between St. Petersburg and its port, calls into question whether this information was the best available before the Department.

However, Zhejiang Sanmei does not argue nor rely on this drastic difference in cost alone to show the inclusion of the inland freight rate data between St. Petersburg and its port was distortive and misrepresentative, as Commerce contends.  Defendant's Br. at 11.  Rather, Zhejiang Sanmei has consistently contended that the distance and nature of the inland freight data from St. Petersburg to its port is aberrational since it is misrepresentative of Zhejiang Sanmei's situation, and that the inclusion of this dissimilar situation had a distortive impact on the final margin.  Pl. Br. at 8.  The data is not aberrational because of the higher costs of the freight alone, but rather because the data comes from a type of short-distance, intra-city freight in which Zhejiang Sanmei does not participate.  Indeed, Zhejiang Sanmei's argument could not apply to the exclusion of the Moscow inland freight data as Commerce contends, because the Moscow data involves the type of long-distance, inter-city inland freight in which Zhejiang Sanmei is similarly engaged.  *See* Defendant's Br. at 11.

Based on the foregoing, Commerce's inclusion of the aberrational short-distance, intra-city freight rates in the calculation of the inland freight surrogate value was distortive, misrepresentative, and grossly overstated Zhejiang's calculated margin in this case.  Inclusion of this data in the calculation of the surrogate price for a company that engages solely in long-

7

distance transport was unsupported by substantial evidence and should be remanded to Commerce with instructions to calculate an inland freight surrogate value that is reflective of the long-distance transport used by Zhejiang Sanmei.

**B.** **Commerce Incorrectly Calculated the Inland Freight Surrogate Value by Using a Simple Averaging Method for Calculating Inland Freight.**

Zhejiang Sanmei maintains that should the Court affirm Commerce's inclusion of the intra-city freight data in the calculation of the surrogate price for Zhejiang Sanmei's inland freight, then the Court should remand Commerce's average US Dollar per metric ton per kilometer ("USD/KM/MT") freight rate calculation. To properly calculate the average USD/MT/KM from the two Russian transactions, Commerce should have employed a weighted-average methodology.

Commerce is not limited by § 1677b(c) to a single method of arriving at the surrogate value. 19 U.S.C. § 1677b(c) (2015). Indeed, it has a duty to calculate a surrogate value that is "as representative of the situation in the nonmarket economy country as is feasible," and to determine the dumping margins as accurately as possible. *Shakeproof Assembly Components, Div. of Ill. Toolworks, Inc. v. United States,* 268 F.3d 1376, 1382 (Fed. Cir. 2001); *Lasko Metal Products, Inc. v. United States; National Ford Chem. Co. v. United States*, 166 F.3d at 1377 (Fed. Cir. Feb. 1999). Though Commerce contends that the application of a simple average is consistent with its prior practice, this neither binds it to employing the simple averaging method, nor does this precedent relieve it of its duty to determine the dumping margins as accurately as possible. Defendant's Br. at 12. Rather, Commerce must employ the method that will determine the dumping margins as accurately as possible, and in calculating the normal value in the non-market economy context, "the particular aim of the statute is to determine the non-distorted cost

8

of producing such goods." *Horne Meridian Int'l, Inc. v. Great Rich (HK) Enterprises Co., Ltd.*, Slip Op. 13-81 at 7 (CIT June 2013).

Here, the weighted average method would result in a surrogate value and margin that is more accurate than under the simple-average methodology employed by Commerce.  Since the weighted average method requires the averaged dollar cost of the two transactions be divided by the average weight of the two transactions and then divided by the average distance of the two transactions, it is the only methodology that will result in the intended "average USD per MT per KM" freight rate.  Therefore, as shown in Zhejiang Sanmei's original brief the correct weighted average export truck freight rate calculation would be USD 602/15MT/366 KM = USD 0.1097/MT/KM, or USD 0.1066/MT/KM when the deflator is applied; and the correct weighted average import truck freight rate calculation would be USD 448/15MT/254KM = USD 0.1176/MT/KM, or 0.1143/MT/KM when the deflator is applied.  Pl. Br. at 12-13.

Commerce's simple average methodology does not result in an accurate averaged USD/MT/KM surrogate value for the two transactions.  *See* Surrogate Value Memorandum for the Preliminary Determination at Page 10 and Exhibit 8, *supra*; Appx. Tab 7. Rather, it takes the USD/MT/KM for each transaction and takes the average of those results.  Commerce's simple average based calculations resulted in an average export truck freight rate of USD 1.039/MT/KM, and an average import truck freight rate of USD 1.038/MT/KM. *Id*.  Commerce's freight rates thereby overstated the weighted averages by 874.67% and 808.14% respectively. *Id*.  This method is flawed since it does not reflect an averaged USD/MT/KM freight rate, but rather an average of the two rates.  Zhejiang Sanmei has shown that the weighted average methodology would be a more accurate method for calculating the surrogate value since it would result in the averaged USD/MT/KM freight rate, and would fully consider the cost, weight, and

9

distance.  On the other hand, Commerce's simple averaging methodology could lead to distortions, as it would emphasize the large disparity in distance between the intra-city and long-distance transport mileage, rather than applying fair consideration to all elements of the calculation.

The cases that Commerce cites to are easily distinguished from the present case.  The fundamental cases upon which Commerce relies is *Rhodia, Inc. v. United States* and *Zhejiang Native Produce and Animal By-Products Imp. and Exp. Corp* to support the conclusion that the simple averaging methodology is Commerce's general practice.  *Compare Rhodia, Inc. v. United States*, 1185 F. Supp. 2d 1343, 1350 (Ct. Int'l Trade 2001) *with Zhejiang Native Produce and Animal By-Products Imp. and Exp. Corp. v. United States*, 28 C.I.T. 1427, *7 (CIT 2004).[3]  In *Rhodia,* Commerce had employed a weighted average methodology in calculating the surrogate value for financial data, and the Court remanded because Commerce did not explain why it chose to depart from its general practice of using a simple averaging methodology.  *See Rhodia, Inc*., 1185 F. Supp.2d at 1350.  However, the Court did not reject the possible use of a weighted average methodology and stated that it could even be the "the correct method to calculate the necessary ratios."  *Id*.  The issue was a lack of explanation, which would not be present for

---

[3] In *Zhejiang Native Produce* Commerce calculated a surrogate value for all raw honey pricing information using a simple average.  The Court initially remanded to Commerce to remove a certain nation's data from the surrogate value calculation since it yielded a result "sufficiently incredible to call into question its reliability."  *Id*. at *6.  Its discussion of the simple average methodology is limited to stating that it was supported by substantial evidence and that it is the general practice of Commerce to employ a simple average methodology.  *Id*. at *7.  This case does not state that Commerce cannot employ other methods, that simple averaging is always the best available information, nor did it involve a dispute over the accuracy of a simple average against the use of a weighted average.  *See id*.  Indeed, the Court instructed Commerce in the prior proceeding that should the resulting calculation exceed that of the weighted average of the honey unit import values, that Commerce must explain how this calculation furthered the goal of estimating the antidumping duty margins as accurately as possible.  *Id*. at footnote 5.

10

Zhejiang Sanmei.  Here, the issue is that the weighted average is the correct methodology to apply, since it accurately reflects the averaged USD/MT/KM freight rate rather than the average of the USD/MT/KM freight rate for each transaction.

Further, *Rhodia* relied on the analysis provided in Commerce's final determination of *Bicycles from the People's Republic of China* to support the remand of the weighted average methodology.  *Id*.  In that case, however, Commerce explained that it had no basis to conclude that a weighted-average calculation would be "a more accurate measure of the costs of Indian surrogate producers," and employed the simple average for these financial statements because it assumed all surrogate values were equally representative of the surrogate experience.  *Notice of Final Determination of Sales at Less than Fair Value: Bicycles from the People's Republic of China*, 61 Fed.Reg. 19,026, 19,039 (Dep't of Commerce April 30, 1996).  That case had an additional complication, since Commerce found that the weighted average methodology would have implied the experience of larger Indian Producers were more representative of Chinese producers than the experience of smaller Indian producers.  *See id*.  Thus, Commerce has rejected the application of a methodology other than simple averaging where it would be distortive or aberrational.  *See Fresh Crawfish Tail Meat from the People's Republic of China Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review of Freshwater Crawfish Tail Meat from the People's Republic of China: Review and Rescission of Review in Part,* 74 Fed. Reg. 6571 (Feb. 10, 2009) *and Accompanying Decision Memorandum at Comment 1* (Commerce rejected the petitioner's alternative method for calculating the inland freight surrogate value because it did not demonstrate that the simple-average methodology distorts the calculation of the surrogate values and ultimately the margin); *Certain Polyester Staple Fiber from the People's Republic of China: Final Partial Affirmative*

*Determination,* 72 Fed. Reg. 19690 (April 19, 2007) *and Accompanying Decision Memorandum at Issues and Decision Memorandum* at Comment 5 (where Commerce utilized a simple average of the data since it achieved the most representative value and minimized the potential for distortions); *Certain Fabricated Structural Steel from the People's Republic of China*: *Final Affirmative Determination*, 85 Fed. Reg. 5376 (Jan. 30, 2022) and Accompanying Decision Memorandum at Comment 4 (Commerce rejected calculating inland freight surrogate value using the respondent's proposed method because it would introduce inaccuracies into the surrogate value, not because simply averaging was mandated.)

Commerce was bound to determine the dumping margins as accurately as possible, to determine the non-distorted cost of producing such goods.  *See Shakeproof Assembly Components*, 268 F.3d at 1382; *see also Horne Meridian International, Inc.*, Slip Op. 13-81 at 7. Zhejiang Sanmei has shown that the weighted-average methodology would have resulted in more accurate and less distortive costs of producing such goods.  Commerce has generally declined the use of alternative methods to a simple-average where they would introduce inaccuracies into the record.  But here it was the simple-average, not the weighted-average that introduced inaccuracies into the record.  Therefore, the Court should remand to Commerce with instructions to incorporate the correct weighted averaging methodology necessary to calculate the most accurate and least distortive weighted average USD/MT/KM inland freight factors for import and export transactions.

## II. COMMERCE IMPROPERLY VALUED THE INTERMEDIATE INPUT ANHYDROUS HYDROFLUORIC ACID (AHF)

### A. The Administrative Record Establishes that All Sales of Subject Merchandise Were Self-Produced by Sanmei's Production Affiliate Fujian Qingliu

12

Importantly, Commerce usually values intermediate inputs by valuing the upstream inputs.  Defendant's Br. at 16.  Commerce departed from this practice here on the alleged grounds that  Zhejiang Sanmei was unable to differentiate between its usage of self-produced anhydrous hydrofluoric acid (AHF) and purchased AHF.  The Government ignores the highly relevant fact, however, the Zhejiang Sanmei's sales were ultimately excluded in total from the U.S. sales databased, and the only sales relevant to the calculation were five transactions made by Zhejiang Sanmei's affiliate, Fujian Qingliu.   See Preliminary Decision Memorandum at 25-26; P.R. 220; Appx Tab 12.   The AHF that Fujian Qingliu consumed in the production of the subject merchandise during the period of investigation was entirely self-produced and thus should have been valued based on its factors of production.  *See* Sanmei Section D Response at Exhibit VI-6, Page 6; Confidential Record ("CR") 102; Appx. Tab 8.  In other words, it should not matter whether Zhejiang Sanmei distinguished between self-produced and purchased AHF, because Commerce ultimately calculated the U.S. price of the subject merchandise using only sales of subject merchandise by Zhejiang Sanmei's affiliate, Fujian Quingliu.

The Government argues that Commerce determined that necessary factors of production information for Fujiang Qingliu were not available on the record.  Gov't Brief at 17.  Specifically, the Government claimed that it could not calculate Fujian Quingliu's factors of production by the production of AHF because the latter did not value its water consumption, nor did it track its yield loss for the upstream inputs, and thus it could not report or substantiate the consumption of upstream material inputs used in the production of AHF.   The record evidence, however, presented viable options for the calculations of both water consumptions and yield loss for the upstream inputs, as discussed above.

**B.    Zhejiang Sanmei's Provided Sufficient Information to Calculate Water Consumption and Yield Losses  for Fujian Qingliu.**

1.    <u>**Water Consumption**</u>

Commerce chose to directly value AHF since the record did not contain information from Fujian Qingliu concerning water consumed during production of the subject merchandise, which is a significant cost element that impacts the total yield loss.  Defendant's Br. at 17 (citing Final Issues and Decision Memorandum at 23-24).  Commerce confusingly continues to contend that Zhejiang Sanmei's water consumption valuation cannot be used as a surrogate value for Fujian Qingliu's water consumption since the two companies employ different manufacturing processes and Fujian Qingliu only provided processing services to Zhejiang Sanmei for a small amount of the subject merchandise.  Defendant's Br. at 17-18; see Final Issues and Decision Memorandum at 23.  Commerce notes that valuing the upstream factors of production would be "convoluted and not based on Fujian Qingliu's or Sanmei's own experience," and would thereby lead to an inaccurate result.  See Final Issues and Decision Memorandum at 23.  Yet, Commerce's refusal to consider Sanmei's reported water consumption is incongruous with other findings in the Issues and Decision Memorandum and not supported by substantial evidence.

First, Commerce noted that Zhejiang Sanmei and Fujian Qinligu employ similar, though not identical, manufacturing processes in the comment concerning the factors of production.  See id. at 35.  Commerce does not deny that both Sanmei and Qingliu consume water in the production of the AHF, nor does it note that this consumption would be substantially different between the two companies.  See id. at 23, 35. The only difference of note in the two companies manufacturing processes is the source of the heat.  Id. at 23, 35. The reason that Fujian Qingliu cannot report its water consumption is because the company obtains water from its own wells rather than from a water utility company.  Since Sanmei's and Qingliu's manufacturing processes are substantially similar, using Sanmei's water consumption as a surrogate value for

Fujian Qingliu's would not be convoluted or "not based on Fujian Qingliu's or Sanmei's own experience," as Commerce contends. Id. at 23, 35. Instead, it would be an accurate reflection of the water consumed in the manufacturing process for AHF.

Secondly, Commerce accepted the use of Zhejiang Sanmei's reported water consumption to derive Fujian Qingliu's factors of production for water as a direct material input. Id. at 35. But as to why this valuation was sufficient for the factors of production of the subject merchandise and insufficient for the valuation of upstream factors of production for the intermediate product of AHF, Commerce offers little explanation. See id. at 23, 35. This disparity is further exacerbated considering that the consumption of water is a factor of production for both AHF and the subject merchandise; yet Commerce treats it differently despite it being the same input. See id. at 23, 35. Commerce seeks to depart from its standard practice of valuing the upstream inputs here because it claims the valuation would result in an inaccurate calculation since water consumption is a significant cost in the overall factors buildup. See Defendant's Br. at 16 (citing *Linyi Chengen Imp. & Exp. Co. v. United States*, 487 F.Supp.3d 1349, 1355 (Court of Inter'l Trade 2020)). However, since Zhejiang Sanmei's water consumption would be an accurate surrogate value for Fujian Qingliu's water consumption in the overall factors of production, it would also be accurate as a factor of production for AHF. Thus, using this surrogate value would result in a more accurate calculation than Commerce's direct valuation of AHF. Commerce's inconsistent treatment of Zhejiang Sanmei's reported water consumption as a direct input for Fujian Qingliu has yielded the convoluted result Commerce claims it was trying to avoid. Consequently, Commerce's failure to value Fujian Qingliu's reported factors of production should be reversed.

**Public Version**

### 2.    <u>Yield Loss</u>

Zhejiang Sanmei provided a method to accurately calculate its yield loss even though it did not track its yield loss in the normal course of business.  To account for the yield loss, it is common knowledge that yield is the reciprocal of consumption rate and yield loss = 1 – yield. The consumption rate is derived by input over output and the yield is output over input such that the yield loss is 1 – yield.  Therefore, when inputs and outputs are known, it is straightforward to derive the consumption rate or yield loss.

As displayed in Zhejiang Sanmei's initial brief, the administrative record confirms that the total inputs for AHF were equal to [          ] MT, including [              ] MT of fluorite power, [              ] MT of 98% sulfuric acid, [              ] MT of 105% sulfuric acid, [          ] MT of water at Zhejiang Sanmei, and [          ] MT of calculated water at Fujian Qingliu.  *See* Zhejiang Sanmei Verification Response at Exhibits 15.1-15.10; PR # 175-187; Appx. Tab 14.  The total reported output was equal to [          ] MT, including [              ] MT of fluosilicic acid by product and [              ] MT of fluorine gypsum by-product.  The total yield loss was thus [          ] – [          ] = [          ], or about [      ]%. This demonstrates an accurate calculation of the total yield loss.

Commerce notes that this calculation was not used by Fujian Qingliu or Zhejiang Sanmei in the ordinary course of business and that it cannot be used to substantiate the inputs and outputs in the production of AHF.  It is true that neither company regularly tracks its yield loss.  But yield loss can be calculated using the above equation.  It does not matter whether the equation was used in the ordinary course of business so long as it determines an accurate total yield loss. Further, Sanmei addressed Commerce's concern that it was not substantiating the inputs and outputs with its yield loss.  Sanmei provided its inventory subledgers as additional supporting

16

143958261.2

documents for the by-products produced while manufacturing AHF, which reconciled with the total raw materials consumed for 98% sulfuric acid, 105% percent sulfuric acid, and fluorite powder.  The warehouse-out quantity and value booked in the invoice sub-ledgers reported the materials withdrawn to the production department.  Zhejiang Sanmei Supplemental Section D Response at Exhibit SD-3 (Sanmei), Exhibit SD-9 (Qingliu); C.R. 128 (Sanmei) and 130 (Qingliu); Appx. Tab 13.  These figures tie the debit figures booked in the cost of manufacture sub-ledger.  *Id*. at Exhibit SD-5  (Sanmei) and Exhibit SD-11 (Qingliu); C.R. 129 (Sanmei) and 130 (Qingliu); Appx. Tab 13.  The credit figures in the sub-ledger of COM reconcile to the figures in the cost calculation worksheets.  *Id*. at Exhibit SD-6 (Sanmei) and SD-12 (Qingliu); C.R. 130; Appx Tab 13.  The factors of production reported in the cost calculation worksheets tie directly to the FOPs data reported in the factors of production database provided to Commerce. Therefore, documentation has been provided to help substantiate the reported upstream material inputs used in the production of AHF and to verify the accuracy of the yield loss calculation used above.

III.   **COMMERCE'S DECISION TO DENY ZHEJIANG SANMEI A BY-PRODUCT IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE**

Commerce denied Zhejiang Sanmei claimed by-product offsets for its production of AHF, which produced fluosilicic acid and fluorine gypsum by-products, and the production of R-125, which produced hydrochloric acid and R-134a by-products.  Commerce incorrectly denied the byproduct offset for these four by-products, finding that Sanmei failed to meet the requirements of showing that "actual sales of byproducts could be traced to the actual production of those byproducts through production of subject merchandise during the period of review." *See* Defendant's Br. at 23; *see also* Final Issues and Decision Memorandum at 29.  However, there was sufficient evidence on the record to support by-product offset in this case.

17

Zhejiang Sanmei has previously refuted Commerce's contentions for AHF, and thereby

its by-products in section II above.  Commerce claims that it could not substantiate the claimed

offsets for Sanmei or Qingliu because it could not determine if the AHF was purchased or self-

produced, because neither company tracked the yield loss, or the water consumption of Fujian

Qingliu.  Firstly, Commerce removed all sales with invoice dates outside of the period of

investigation from the U.S. calculation, and thus all of Zhejiang Sanmei's transactions were

similarly removed.   Preliminary Decision Memorandum at 25-26; P.R. 220; Appx Tab 12.  The

inability to differentiate between purchased and self-produced AHF was an issue related to

Zhejiang Sanmei's data and was no longer at issue once Zhejiang Sanmei's valuation was

removed from the calculation. *See Final Issues and Decision Memorandum* at 22-23.  Secondly,

with respect to yield loss and despite Commerce's contentions, Sanmei was able to report the

consumption rate of all inputs accurately and precisely in its FOP database.  When input and

output quantities are known, the derivation of the yield loss is straight forward, and the yield loss

for AHF was calculated as [     ]% and for the subject merchandise was calculated as [     ]%.

Zhejiang Sanmei Case Brief at 23; C.R. 190; Appx. Tab 15.  Lastly, with respect to water

consumed by Fujian Qingliu, Zhejiang Sanmei's water consumption could be used as a surrogate

value for Fujian Qingliu's in the FOP calculation.  Zhejiang Sanmei Section D Response, *supra*

at Page 15; Appx. Tab 8.  Zhejiang Sanmei provided supporting documentation with detailed

information calculating water consumption in each production workshop and water consumed as

an energy component. *See* Zhejiang Sanmei Verification Response at Exhibits 13-1 through 13-

4; C.R. 175-187; Appx. 14.  As discussed in section II, Qingliu and Sanmei employed similar

production processes, and Commerce utilized Zhejiang Sanmei's water consumption as an

accurate surrogate value for Fujian Qingliu's water consumption in the overall factors of

18

production.  Commerce provides no reason for why this evidence cannot be used to substantiate Fujian Qingliu's byproduct production for AHF, especially where it would yield a more accurate result.  Therefore, Zhejiang Sanmei has provided the evidence necessary to substantiate the claimed offsets produced in the production of AHF and Commerce's decision to not provide offsets for these by-products should be reversed.

Commerce further disputes the claimed offset for hydrochloric acid byproduct because it could not determine how much of the hydrochloric acid ultimately sold or used was actually a by-product of the production of the subject merchandise.  Defendant's Br. at 22; *see also* Final Issues and Decision Memorandum at 30.  Commerce argues that it could not determine from the record how much of the "hydrochloric acid that was ultimately sold or used was actually a by-product of production of subject merchandise."  Defendant's Br. at 22; *see also* Final Issues and Decision Memorandum at 30.  Zhejiang Sanmei used only generated quantities from the R-125 workshop to calculate the by-product offset ratio pursuant to the calculation instructions and claimed no hydrochloric acid by product offsets from production of non-subject merchandise. *See* Zhejiang Sanmei Supplemental Section D Response, *supra* at Exhibit SD-14; Appx. Tab 13. Commerce claims that the records provided do not show a difference between the hydrochloric acid produced in the production of the subject merchandise and other merchandise.  Sanmei has admitted that hydrochloric acid is the only by-product created in the production of both subject and non-subject merchandise.  However, by reconciling the figures of the by-products which entered inventory and the workshop that generated the by-product with the figures in the production reports, which included by-products produced during the production of AHF and the subject merchandise, Sanmei has shown the amount of the by-product that was created in the production of the subject merchandise and which workshop it came from.  Zhejiang

19

Supplemental Section D Response at Exhibit 8; C.R. 130; Appx Tab 13.  Commerce's final

contention is similarly dealt with.  By knowing the amount of hydrochloric acid that was

produced in the production of the subject merchandise and knowing how much of that overall

by-product was sold, a simple use of subtraction can determine how much of the overall by-

product sold was produced in the production of the subject merchandise.  *See id*.  The sales

Sanmei accounted for did not need to differentiate between the hydrochloric acid that was

generated in the production of subject merchandise versus the production of non-subject

merchandise because the figures themselves can show the story of the by-product and its sales.

Therefore, Sanmei submitted sufficient documentation to determine both the amount of

hydrochloric acid produced in the production of the subject merchandise and the amount that was

ultimately sold.

Finally, with respect to the claimed offset for R-134a byproduct, Commerce found that

record evidence was unclear as to the processing that R-134a undergoes prior to introduction in

the non-subject merchandise, that Sanmei failed to provide adequate records for tracking the

production and sales of R-134a, and that it was unclear if Sanmei and Qingliu are able to

distinguish R-134a resulting from production and that which was purchased from other parties.

Defendant's Br. at 23.  However, the record shows that R-134a was only from the production of

the subject merchandise (R-125), such that there was no need to differentiate the by-products as

to whether they resulted from the production of subject merchandise or non-subject merchandise.

Further, and as explained above, Zhejiang Sanmei reported the monthly quantities of each of the

four by-products produced and sold by Zhejiang Sanmei and Fujian Qingliu.  *See* Sanmei

Section D Response, supra at Exhibit D-12; Appx Tab 8.  It showed which of the by-products

entered into inventory, which workshop generated the by-product, and reconciled these numbers

with the production report to show that by-products produced during the production of the subject merchandise and AHF.  Zhejiang Supplemental Section D Response at Exhibit 8; C.R. 130; Appx Tab 13.  Like with hydrochloric acid, the self-produced and purchased R-134a byproduct can be distinguished through these figures, and the sales tracked accordingly.  Further, Sanmei submitted a large volume of information detailing the physical and chemical descriptions and sample testing reports for each of the by-products that show the production process which R-134a underwent prior to introduction in the non-subject merchandise.

Since none of the reasons provided by Commerce to reject Zhejiang Sanmei's adequately documented by-product offsets in the final determination were supported by substantial evidence, Commerce's final determination with respect to by-product offsets should be reversed.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, and for the reasons set forth in Zhejiang's Sanmei memorandum in support of its Rule 56.2 motion, For the foregoing reasons the Court should find Commerce's final determination to be unsupported by substantial evidence in the administrative record with respect to its determinations contested in this action.  The Court should therefore remand this action to Commerce with instructions for Commerce: 1) to recalculate the surrogate value for inland freight truck transport; (2)to  apply the intermediate input rule and use the reported FOPs used to produce AHF rather than to value the AHF input directly; and 3) to grant the by-product offsets the claimed Zhejiang Sanmei.

Respectfully submitted:

/s/ *Lizbeth R. Levinson*

Lizbeth R. Levinso
Brittney R. Powell
FOX ROTHSCHILD LLP
2020 K Street, NW
Suite 500

21

Washington, DC  20006
Phone:  (202) 461-3100
Email: llevinson@foxrothschild.com

April 3, 2023

143958261.2

## <u>Word Count Certificate of Compliance</u>

This brief has been prepared utilizing Microsoft Word 2016 using a proportionally spaced typeface (12-point Times New Roman font).

In accordance with this Court's Scheduling Order and the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth therein.  Specifically, excluding those exempted portions of the brief, as set forth in 2 B (1) of the Chambers Procedures, I hereby certify that this brief contains 6244 words.  This certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

*/s/ Lizbeth R. Levinson*

Lizbeth R. Levinson
Brittney R. Powell

FOX ROTHSCHILD LLP
2020 K Street, NW
Suite 500
Washington, DC  20006
 Tel:   202-794-1183
 Fax:   202-461-3102

April 3, 2023